BERNARD L. PACELLA AND THERESA PACELLA, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 11372–77.    Filed April 14, 1982.

*Ephraim London*, for the petitioners.
*Theodore J. Kletnick* and *Anne Hintermeister*, for the respondent.

NIMS, *Judge*: Respondent determined deficiencies in peti-

---

tioners' Federal income taxes for the years 1971, 1972, and 1973, in the amounts of $17,980.80, $7,362.38, and $8,960.67, respectively. As a result of various concessions, the sole issue for decision is whether income attributable to petitioner Bernard L. Pacella's medical practice is taxable to him instead of his wholly owned professional corporation.

## FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation and the exhibits attached thereto are so found and incorporated herein by reference.

At the time the petition in this case was filed, petitioners resided in New York City. Theresa Pacella is a petitioner by virtue of having filed a joint return with her husband, Bernard, who for convenience is hereinafter referred to as petitioner or Dr. Pacella.

Petitioner is a prominent New York physician who has specialized in psychiatry, psychoanalysis, and neurology since 1948.

During the years at issue, petitioner was engaged in numerous activities. In addition to conducting a substantial private medical practice, he was: Director of the Department of Child and Adolescent Psychiatry at Roosevelt Hospital in New York; sole proprietor of Regent Hospital, a small New York private psychiatric hospital for treatment of mental illness, drug addiction, and alcoholism; a consultant to the New York City Transit Authority; and a consultant to Columbia-Presbyterian, St. Luke's, St. Joseph's, St. Clare's, and St. John's Hospitals, all in New York City. (He received no compensation for his services as a consultant to these last-named hospitals.)

Regent Hospital employed between 18 and 25 employees during the years in question. It kept its books on the accrual method of accounting and petitioners reported its earnings on a separate Schedule C of Form 1040 during the years at issue. Petitioners otherwise reported their income on the cash receipts and disbursements method of accounting.

The day-to-day management of Regent Hospital during the period 1968 to 1973 was entrusted to Noelle Corish, the hospital administrator. Dr. Hyland Flowers was medical director of the hospital, but retired from that post in early

1971; he was succeeded at that job by Dr. Joseph Doltolo. Prior to January 1971, Dr. Pacella was also extensively involved in the administration and management of Regent Hospital.

The building in which Regent Hospital was located and in which, on another floor, Dr. Pacella conducted his private practice, was owned by a cooperative corporation. Until September 30, 1971, Dr. Pacella owned the shares of stock which related to the space occupied by Regent Hospital as well as the space occupied by his private practice.

Other members of the petitioner's family were heavily involved with psychiatry. In 1970, his daughter, Karen, was a physician and a resident in the New York State Psychiatric Institute. Her fiance, later her husband, was then chief resident of the same institute. Dr. Pacella's youngest son, then in secondary school, had expressed an interest in following in his father's footsteps by becoming a psychiatrist and, at the time of the trial of this case, was a student at Harvard Medical School.

In 1970, Dr. Pacella consulted his attorney, Everett Frolich, about the advisability of creating a professional corporation. Dr. Pacella believed that operating his private practice as a professional corporation would facilitate the transfer of part of that practice to his children when and if they should enter the business. He was also aware that tax advantages were expected to inhere in a professional corporation.

Bernard Pacella, M.D., P.C. (hereinafter the P.C.) was incorporated on October 21, 1970, pursuant to article 15 of the New York Business Corporation Law, as a professional service corporation. The certificate of incorporation of the P.C. was filed with the New York Department of State, Division of Corporations and State Records on that date. On October 27, 1970, a certified copy of the certificate of incorporation was filed with the New York Supervisor of Professional Licensing.

Article Third of the certificate of incorporation indicated that Dr. Pacella was to be the sole original shareholder, director, and officer of the P.C. Article Fifth provided the P.C. with authority to issue 100 shares with no par value.

On November 25, 1970, the first shareholder meeting of the P.C. was held at which corporate bylaws were adopted. At a board of directors meeting that same day, a corporate seal was also adopted.

On November 25, 1970, an employment contract was entered into between Dr. Pacella, in his individual capacity, and the P.C. The original of such contract was lost when petitioner changed attorneys, but a carbon duplicate of the contract, lacking many key numerical entries, still survives. Under this contract, Dr. Pacella was to be employed for a 3-year period commencing on an undeterminable date (this entry is missing). The contract further provided:

*2. Duties of Employee*

Employee shall devote substantially all his time and attention to the practice of medicine on behalf of Employer. Employee shall also be permitted to spend reasonable periods of time for other activities, except the practice of medicine, including but not limited to, teaching, personal or outside business and charitable activities, without such activities being deemed a breach of this Agreement.

Dr. Pacella was to be paid a fixed monthly salary plus an annual bonus based on a percentage of the P.C.'s net profits (the exact numbers here are also missing).

The contract further provided for the termination of Dr. Pacella's employment should he cease to be authorized to practice medicine in New York, become a "disqualified person" pursuant to section 1509 of the New York Business Corporation Law, or die.

Finally, the contract provided for Dr. Pacella to be reimbursed for various business-related expenses and obligated the doctor to reimburse the corporation for any compensation he received from the P.C. for which the P.C. was prohibited, by a competent court, from taking a tax deduction.

When Dr. Pacella changed attorneys, at some point the absence of the original employment contract was discovered and a new employment contract similar to the prior contract was prepared. This new contract was a form contract usable for any professional corporation. Most, but not all, of the blank spaces on this new form contract were filled in. The contract was signed by Dr. Pacella in several places and at several different times; however, two important types of entries on the contract were, at the direction of his new attorneys, left blank: the dates of the contract and the amount of salary to be paid Dr. Pacella in each year of the contract. Ultimately, the contract was dated as effective September 15, 1972, and various signatures of Dr. Pacella were dated September 15,

1972, September 15, 1973, and September 15, 1974, together with salary figures of $31,000, $32,000, and $37,000, for each of those years respectively. These dates and salary figures were inserted by an unknown hand.

On December 1, 1970, Dr. Pacella transferred the furniture, fixtures, equipment, and files of his private practice to the P.C. in a tax-free exchange for all 100 shares of the stock of the P.C. The aggregate basis of these items at the time of the transfer was $1,181.38. The P.C. occupied the same suite of offices that was used by petitioner for his private practice prior to incorporation.

On December 1, 1970, the P.C. also adopted a qualified pension plan which in later years was conformed to the provisions of the Employment Retirement Security Act of 1974 (ERISA). In an application for determination of initial qualification of the plan made March 31, 1971, two employees of the P.C. were listed as plan participants: Dr. Pacella and Ruth Uffelman. Ruth Uffelman served as the P.C.'s medical secretary at a salary of approximately $8,000 per year until her death in late 1973. Until September 1973, petitioner and Ruth Uffelman were the only employees of the P.C.; thereafter, petitioner's wife, Theresa Pacella, served as secretary.

The P.C. made contributions to the pension plan on behalf of its covered employees as follows:

| FYE Sept. 30— | Contribution |
| --- | --- |
| 1971 | $19,025.00 |
| 1972 | 24,414.77 |
| 1973 | 19,877.24 |
| 1974 | 28,262.16 |

For the fiscal year ending September 30, 1971 (the only year for which this information is available), 15.7 percent of the pension plan contributions by the P.C. were attributable to coverage of Ruth Uffelman.

During either the month of December 1970 or January 1971, a meeting was held by Dr. Pacella, Dr. Hyland Flowers, Dr. Joseph Doltolo, and Noelle Corish at Regent Hospital. At this meeting, it was agreed that henceforward all clinical treatment of inpatients at Regent Hospital by Dr. Pacella would be billed for by the P.C. A rate of billing of $55 per hour for Dr. Pacella's services was arrived at. Such rate was a reasonable

rate in light of Dr. Pacella's then practice to charge individual patients anywhere from $35 to $75 per hour for clinical therapy, depending on the patient's ability to pay.

On his Federal income tax returns for years up to and including 1970, Dr. Pacella had not allocated any amount of his Regent Hospital Schedule C income to his separate Schedule C income for his private psychiatric practice.

Starting in December 1970 and continuing through each of the years in issue, the P.C. submitted monthly bills for the services of Dr. Pacella to Regent Hospital. Such bills were paid by checks drawn to the order of the P.C. after verification was made that the billed work was actually performed. However, no written contract memorialized this employment agreement with Regent Hospital.

During the years at issue, the P.C. maintained separate books and records; maintained a separate checking account; filed all appropriate Federal and State tax returns and paid the taxes shown on such returns; paid both petitioner and Ruth Uffelman salaries; subscribed to magazines; paid telephone bills (though the phone listing remained in the name of Dr. Pacella as an individual); paid rent on the cooperative suite in which the P.C. carried on business; and paid numerous other minor bills (e.g., for utilities, stationery, etc.) which were ordinary and necessary expenses of carrying on a private psychiatric practice. In addition, billheads and letterheads sent in connection with the P.C.'s psychiatric practice bore the name of the P.C. The sign on the office door of the suite used by the P.C. also bore its name.

The corporate records of the P.C. relating to shareholder meetings and board of directors meetings indicate that such meetings were held once a year, usually in the month of September. Documents relating to these corporate meetings were prepared and kept by Dr. Pacella's new attorneys in a rather haphazard fashion. The attorneys prepared various minutes and waivers of notice of meetings and sent them to Dr. Pacella or Ruth Uffelman for their signatures. The minutes and waivers of notice were generally undated when sent to Dr. Pacella. On the instructions of his new attorneys, Dr. Pacella returned these documents signed by himself or Ruth Uffelman, but still undated. At some point, a number of these documents were dated by an unknown hand. In particu-

lar, the following documents were each dated September 15, 1972, by this unknown hand: "Minutes of Special Meeting of Board of Directors" at which the P.C. adopted a 100-percent medical reimbursement plan for Dr. Pacella and his family, "Minutes of Meeting of Board of Directors" at which the P.C. adopted Dr. Pacella's employment contract of the same date, "Minutes of Meeting of Board of Directors" at which the pension plan and trust were readopted, and three waivers of notice regarding these meetings, each signed by Dr. Pacella.

From the time of its incorporation, the P.C. paid rent to the cooperative for the suite of offices it occupied, though until September 30, 1971, Dr. Pacella was still the owner of the shares of the cooperative relating to the offices and the named lessee in regard to that suite. On September 30, 1971, Dr. Pacella transferred to the P.C. the shares of stock in the cooperative relating to the space occupied by the P.C.; that stock had a basis of $4,453.21. Also on that date, Dr. Pacella formally assigned his lease to the P.C.

Though after the P.C.'s formation, Dr. Pacella continued to be employed as a consultant or teacher in psychiatry for a number of hospitals and the New York City Transit Authority, he provided clinical treatment and therapy only to individuals who either came to the P.C.'s offices or were patients staying at Regent Hospital. All private individuals coming to the P.C.'s offices were billed for his therapy by the P.C. For all therapy rendered to patients staying at Regent Hospital, the P.C. billed Regent Hospital. Dr. Pacella believed that his exclusive employment contract with the P.C. required that all clinical therapy services he rendered to Regent Hospital be billed by the P.C. or the P.C. would be disregarded for tax purposes. In addition, Dr. Pacella believed that the employment contract required him to curtail many of his administrative duties at Regent Hospital, and he acted accordingly.

Payments to the P.C. from Regent Hospital for Dr. Pacella's services were deducted on a Schedule C relating to Regent Hospital on petitioners' joint income tax returns for the following years in the amounts stated:

| Year | Amount |
|------|--------|
| 1971 | $28,050 |
| 1972 | 24,310 |
| 1973 | 21,845 |

These amounts were reported as income by the P.C. on its returns for the appropriate corporate fiscal years.

The P.C. maintained a fiscal year ending on September 30.

The P.C. did not report any income from Roosevelt Hospital or the Transit Authority during the years in issue. Petitioners reported amounts received from these entities as wages received by Dr. Pacella individually and not as an employee of the P.C.

The P.C. reported the following net income after taxes:

| FYE Sept. 30— | Amount |
|---------------|--------|
| 1971 | $1,167.86 |
| 1972 | 465.29 |
| 1973 | 37.74 |

The P.C. paid the following dividends:

| FYE Sept. 30— | Amount |
|---------------|--------|
| 1971 | 0 |
| 1972 | $500 |
| 1973 | 500 |

On its corporate balance sheets, the P.C. showed the following retained earnings:

| FYE Sept. 30— | Amount |
|---------------|--------|
| 1971 | $1,497.26 |
| 1972 | 1,264.39 |
| 1973 | 681.54 |

The table on page 612 summarizes Dr. Pacella's income from professional activities, including the ownership of Regent Hospital, before and after the formation of the P.C.

In his statutory notice of deficiency and, using somewhat different figures, in his amended answer, respondent denied Regent Hospital any deduction for payments made by it to the P.C. during the years at issue. Further, for each year, respondent included in petitioners' income all income received by the P.C. other than from Regent Hospital and allowed petitioners all deductions taken by the P.C. to which Dr.

| Source | 1968 | 1969 | 1970 | 1971 | 1972 | 1973 |
|---|---|---|---|---|---|---|
| *Salaries:* | | | | | | |
| P.C.—Wages | --- | --- | --- | $32,308 | $32,308 | $32,400 |
| —Other compensation (P.S. 58) | --- | --- | --- | 3,487 | 3,048 | --- |
| Roosevelt Hospital | $20,193 | $16,923 | $17,562 | 18,055 | 20,155 | 21,243 |
| New York City Transit Authority | 1,935 | 1,530 | 1,325 | 1,105 | 990 | 855 |
| Veterans' Administration | 1,550 | --- | --- | --- | --- | --- |
| *Schedule C income:* | | | | | | |
| Private practice | 37,399 | 45,183 | 46,152 | 6,931 | --- | --- |
| Regent Hospital | 66,743 | 63,106 | 77,631 | 29,225 | 55,977 | 35,404 |
| Total income | 127,820 | 126,742 | 142,670 | 91,111 | 112,478 | 89,902 |

Pacella would have been entitled had he conducted his private practice in noncorporate form.

OPINION

The issue for decision is whether the net income of Dr. Pacella's wholly owned P.C. is includable in petitioners' tax returns for the taxable years 1971, 1972, and 1973. Respondent argues that, either under section 482[1] or section 61, the income billed by the P.C. for Dr. Pacella's services to patients of his private psychiatric practice should be reallocated from the P.C. to Dr. Pacella together with the deductions taken by the P.C. in regard to that practice. Secondly, respondent argues that deductions taken on petitioners' Schedules C for Regent Hospital attributable to payments by Regent Hospital to the P.C. for Dr. Pacella's services should be disallowed entirely on the basis of section 482.

Petitioners, on the other hand, contend that neither section 482 nor section 61 sanctions the reallocations made by respondent.

Before addressing these arguments, one evidentiary point needs to be discussed. At trial, respondent sought to demonstrate by expert testimony that Dr. Pacella's employment contract with his P.C. dated September 15, 1972, and various other corporate records bearing that same date, were backdated at some time after August 4, 1977. Respondent's expert asserted that the ink used in (1) dating the contract, (2) dating Dr. Pacella's signatures and inserting salary figures for the years September 15, 1972, September 15, 1973, and September 15, 1974, and (3) dating various other corporate records September 15, 1972, came from a BIC black ballpoint pen which was not manufactured anywhere in the world prior to August 4, 1977. Each of these entries was made by an unknown hand. In addition, respondent's expert sought to prove that Dr. Pacella's signatures, admittedly authentic, on a document entitled "Minutes of Special Meeting of Board of Directors" at which a medical reimbursement plan was adopted, and a document on which Dr. Pacella waived notice of

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as in effect during the years at issue.

that meeting, were also made by the same BIC black ballpoint pen not in existence before August 4, 1977.

Petitioner objected to this testimony on the grounds that ink analysis is not a recognized science. We agree with petitioner and, therefore, find no probative value in respondent's expert's testimony.

In determining questions of evidence, the Tax Court is governed by "the rules of evidence applicable in trials without a jury in the United States District Court of the District of Columbia." Sec. 7453; Rule 143(a), Tax Court Rules of Practice and Procedure.

The test for ascertaining whether evidence is admissible as scientific was first enunciated by the Court of Appeals for the District of Columbia Circuit in *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923):

Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, *the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs.* [293 F. at 1014; emphasis supplied.]

Though this "general acceptance" test has been rejected by a number of circuits (see 3 J. Weinstein & M. Berger, Weinstein's Evidence, par. 702[03], at 702–17 n. 7 (1981), and cases cited therein), it is still applied in the District of Columbia Circuit; see *United States v. McDaniel*, 538 F.2d 408, 412–414 (D.C. Cir. 1976) (spectrographic voice identification); *United States v. Addison*, 498 F.2d 741, 743–745 (D.C. Cir. 1974) (spectrographic voice identification); *United States v. Skeens*, 494 F.2d 1050, 1053 (D.C. Cir. 1974) (polygraph); therefore we apply it here.

Respondent's expert, Dr. Cantu, testified that he had published a monograph on ink analysis with the American Chemical Society and articles on that subject in the Journal of Forensic Science and the Journal of the Official Analytical Chemistry. He also stated that he had testified in 18 cases, mostly criminal, and that his testimony had always been accepted. However, in the only two published cases which the

parties brought to the Court's attention, proffered testimony based on ink analysis was rejected.

In *United States v. Bruno*, 333 F. Supp. 570 (E.D. Pa. 1971), the court was presented with "expert" testimony purporting to show that a certain signature was made by a defendant using a Scripto 3852 ballpoint pen, production of which did not commence until a time subsequent to the date appearing on the questioned document. The method of the government's "expert" witness in *Bruno* was to remove certain "plugs" or punched holes by a hypodermic needle from the questioned signature. These plugs would be placed in a solvent and then a small amount of this mixture would be placed on a coated plate or "chromatogram." Through capillary action, the mixture containing the ink would then separate itself into several component dyes, forming a distinctive pattern on the chromatogram. The chromatogram would then be compared with the chromatograms of known inks in the Government's ink library. By this process, the Government's "expert" determined that the ink used by one of the defendants on the questioned document was Scripto 3852. By checking with the manufacturer, the expert learned that Scripto 3852 had not been manufactured before May of 1967. The questioned document was dated December 18, 1965, so the Government argued that the document was a counterfeit.

The court in *Bruno*, applying *Frye v. United States, supra,* rejected such testimony, stating:

We are convinced that the state of the art in this field of ink identification is not yet sufficiently advanced to be reasonably scientifically certain that an ink of unknown composition is the same as a known ink. The most that can be said is that an unknown ink *appears* to be similar to or different from a known ink. [*United States v. Bruno, supra* at 573; emphasis in original.]

In particular, the court was concerned with the incompleteness of the Government's ink library, which lacked ink from any foreign manufacturers, though the record showed that in 1965, alone, 822,600 ballpoint pens were imported into the United States from Japan. "Obviously," said the court, "a procedure which relies entirely on comparison and elimination cannot be used to make a positive identification when an unknown number of inks cannot be excluded." 333 F. Supp. at 373.

In *Estate of Mandels v. Commissioner*, 64 T.C. 61 (1975), the

Tax Court refused to accept an ink analysis performed by respondent's agents using the ink library of the Alcohol, Tobacco, and Firearms Division of the Internal Revenue Service. Just as in *Bruno,* in *Mandels* we were extremely troubled by the substantial gaps in respondent's ink collections. 64 T.C. at 70–71. In addition, we expressed concern that ink manufacturers are in no way required to report to respondent any newly produced ink, and that, consequently, respondent's knowledge about when certain inks were first manufactured might not be either accurate or comprehensive. 64 T.C. at 71. Finally, we noted that there was nothing in the record concerning the degree of acceptance which respondent's testing procedure may have achieved among other chemists or persons in related disciplines. 64 T.C. at 72.

In the instant case, respondent argues that ink analysis has progressed considerably since *Bruno* and *Mandels* were decided and that his ink library contains many more inks today than it did in 1971 or 1975. Notwithstanding these contentions, it appears to us that the basic principles of ink analysis have remained the same over the years and that respondent's ink library, though larger, is still, as Dr. Cantu conceded, "not that complete." At trial, Dr. Cantu stated that "there are inks, indeed, that are not in our library that were manufactured, particularly inks that were in existence prior to, say, 1968." He also conceded that numerous inks of foreign manufacture are not represented in the ink library.

We do not think that these gaps in respondent's ink library are minor. Apparently due to such gaps, Dr. Cantu, in the instant case, was unable to identify the manufacturer of a black nonballpoint pen used by Dr. Pacella on the employment contract dated September 15, 1972, for two of the doctors' signatures and accompanying date and salary entries. According to Dr. Cantu, only four different inks were employed in making the 19 entries on the contract he tested. If we were to extrapolate this admitted gap, fully 25 percent of inks in circulation in this country might be missing from respondent's library. With such a large number of inks missing, we cannot credit testimony that a particular ink was never manufactured anywhere in the world prior to a date taken from an apparently matching ink in respondent's library.

Further, the continued absence of a large number of foreign-

manufactured inks from the library is troublesome. There is evidence even from the very documents challenged in this case that foreign-manufactured inks are in wide circulation in this country. The signatures of Ruth Uffelman on the minutes of two board of directors meetings of the P.C. were, according to Dr. Cantu, made by a black BIC ink manufactured in England. The absence of a comprehensive foreign ink library is, therefore, far from a trivial defect in performing an ink analysis in this country.

Finally, Dr. Cantu admitted that not all domestic inks manufactured prior to 1968 could be found in respondent's library. The challenged documents herein were each first dated September 15, 1972. We think it entirely possible that they were signed with pens manufactured more than 4 years before their use in 1972. If this were so, the ink would be from a period in which respondent's domestic library is admittedly incomplete.

Beyond these numerous logical problems in respondent's ink analysis method which are discernible even by a layman, there may be other problems in ink analysis of which only forensic scientists or chemists are aware. The mere publication by Dr. Cantu of several articles on ink analysis does not demonstrate that ink analysis has acquired general acceptance in the scientific community. Respondent's failure to adduce any other evidence as to the general acceptance of Dr. Cantu's procedure is fatal to the probativeness of the doctor's testimony under the *Frye* standard.

Consequently, we hold that the various documents challenged by respondent's expert are authentic and, on the basis of the credible testimony of Dr. Pacella, all dates and entries thereon, though sometimes made by an unknown hand, are accurate.

Turning now to the substantive issues in this case, we first address the question of whether section 482 allows the respondent to reallocate all of the income and expenses of the P.C. to Dr. Pacella.

Section 482 allows the Commissioner to allocate income among related taxpayers to prevent the evasion of taxes or

clearly to reflect the income of each taxpayer's business activities.[2] Respondent's section 482 allocation should not be set aside unless clearly shown to be unreasonable, capricious, and arbitrary. *Ballentine Motor Co. v. Commissioner*, 321 F.2d 796 (4th Cir. 1963).

Section 482 properly applies to the one-man personal service corporation situation. *Keller v. Commissioner*, 77 T.C. 1014, 1022 (1981). So long as the corporation conducts business and its classification as a corporation for Federal tax purposes is not challenged, however, a reallocation of the corporation's entire income to its professional employee-shareholder under section 482 will not be sanctioned merely because one purpose for the incorporation was to obtain the benefits of a medical reimbursement plan and pension plan. *Keller v. Commissioner*, *supra* at 1030; *Achiro v. Commissioner*, 77 T.C. 881, 895–896 (1981).

In the instant case, respondent concedes "that the P.C. was a separate entity validly organized as a professional corporation under New York law." He argues, however, that the income of the P.C. must be reallocated to Dr. Pacella "because Dr. Pacella and not the P.C. contributed to and controlled the earning of the income." We reject such an argument.

Petitioner has adequately shown that the P.C. carried on business during the years at issue. Among other things, it hired employees: Dr. Pacella and Ruth Uffelman; subscribed to periodicals; paid rent; paid utility bills; owned furniture, fixtures, office equipment, and patient files; sent bills and other correspondence on its own stationery; paid all required State and Federal taxes; and provided psychiatric services to Regent Hospital and individual patients.

Respondent vigorously asserts that no written contracts for services between the P.C. and Regent Hospital or the P.C. and Dr. Pacella's former private clients existed and that this fact

---

[2]SEC. 482. ALLOCATION OF INCOME AND DEDUCTIONS AMONG TAXPAYERS.

In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Secretary may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses.

somehow proves that the corporation did not carry on business. We disagree. The presence of a written contract with Regent Hospital would perhaps have been advisable from a tax-planning viewpoint. However, petitioners have demonstrated by the credible testimony of Dr. Joseph Doltolo and Noelle Corish that an oral contract between Regent Hospital and the P.C. was entered into in January 1971. The terms of such contract were that Dr. Pacella's psychiatric services would be provided, as required, to inpatients of the hospital at a rate of $55 per hour. Subsequent monthly billings by the P.C. of Regent Hospital confirmed such an arrangement.

The absence of any written contract of the P.C. with individuals who were former patients of Dr. Pacella's private practice similarly is not fatal. There is no evidence that Dr. Pacella had written contracts with these patients prior to the P.C.'s incorporation. After incorporation, the sign on the P.C.'s separate office suite showed the name of the P.C., and correspondence and billings regarding Dr. Pacella's treatment services were sent under the P.C.'s letterhead. We think these facts sufficient to show that the patients were patients of the P.C. after its incorporation.[3] To require individual patients to sign written contracts with the P.C. prior to each time they were treated by Dr. Pacella would be unrealistic. Outward signs indicated to the public that they were dealing with the P.C., and that we think was sufficient.

Having found that the P.C. engaged in business, we next must determine whether the bargain struck by Dr. Pacella for his services with the P.C. reflected arm's-length dealing. *Foglesong v. Commissioner*, 77 T.C. 1102, 1105 (1981), on remand from 621 F.2d 865 (7th Cir. 1980), revg. a Memorandum Opinion of this Court, reappealed (7th Cir., Feb. 16, 1982); *Keller v. Commissioner, supra* at 1025; *Achiro v. Commissioner, supra* at 897.

In making this determination, the relevant inquiry is whether the total compensation (taking into account current salary as well as pension plan contributions and the medical expense reimbursements), which was paid to

---

[3]Respondent points out that the phone listing for Dr. Pacella was not listed in the name of the P.C. after its incorporation. While we find this fact not helpful to petitioners' case, we do not think it alone requires a finding that the individual patients were clients of Dr. Pacella and not his P.C.

petitioner or contributed on his behalf after the incorporation * * * was essentially equivalent to that which he would have received absent incorporation. [*Keller v. Commissioner, supra* at 1025; fn. ref. omitted.]

Assuming that the P.C.'s gross receipts continued to be on a par with Dr. Pacella's gross receipts in the preincorporation years, one would expect Dr. Pacella, in an arm's-length transaction with an unrelated party, to have bargained for a total compensation package which would approximate the amounts he previously received as a sole proprietor. *Keller v. Commissioner, supra* at 1025.

In the 3 years prior to incorporation (1968, 1969, and 1970), and in a period when Dr. Pacella did not charge Regent Hospital for services rendered to inpatients there, Dr. Pacella reported $37,399, $45,183, and $46,152, respectively, as Schedule C income from his private psychiatric practice. In the 3 years after incorporation, Dr. Pacella received, respectively, total compensation of $56,995 (consisting of $32,308 in wages, $3,487 in P.S. 58 compensation, and roughly $21,200[4] of pension plan contributions on his behalf), $54,956 (consisting of $32,308 in wages, $3,048 in P.S. 58 compensation, and roughly $19,600[5] of pension plan contributions on his behalf), and $50,900 (consisting of $32,400 in wages and roughly $18,500[6] of pension plan contributions on his behalf), from the P.C.

If we were to assume that the preincorporation private practice figures would have been about $20,000 a year higher had Dr. Pacella been billing Regent Hospital for his treatment

---

[4]The reason this pension plan figure cannot be more precise is that the evidence in this case regarding the P.C.'s pension plan contributions on behalf of Dr. Pacella, consists primarily of the P.C.'s aggregate Sept. 30 fiscal year figures. Prior to Sept. 30, 1971, the P.C. contributed $19,025 to its pension plan. In the fiscal year ending Sept. 30, 1972, the P.C. contributed $24,414.77 to its pension plan. Assuming 25 percent of the FYE 9/30/72 contributions were made before Dec. 31, 1971, the P.C. made total pension plan contributions in the calendar year 1971 of $25,128.69 ($19,025 + $6,103.69). Evidence indicates that of the P.C.'s pension plan contributions while Ruth Uffelman was alive, 15.7 percent of such contributions were made for her benefit and not Dr. Pacella's. Accordingly, the $25,128.69 figure must be reduced by 15.7 percent, yielding a calendar year 1971 figure for pension plan contributions on behalf of Dr. Pacella of $21,183.49.

[5]This figure was arrived at by adding 75 percent of the P.C.'s FYE 9/30/72 and 25 percent of the P.C.'s FYE 9/30/73 total pension plan contributions and discounting by 15.7 percent. See note 4 *supra*.

[6]This figure was arrived at by adding 75 percent of the P.C.'s FYE 9/30/73 and 25 percent of the P.C.'s FYE 9/30/74 total pension plan contributions and discounting by 15.7 percent. See notes 4 & 5 *supra*.

services in those years, it would appear that, prior to incorporation, Dr. Pacella received total compensation for treatment services of about $6,000 or $7,000 per year more than he did through his contract with the P.C.

However, as we recognized in *Keller v. Commissioner, supra* at 1028, pension plan contributions may be worth more to a high-bracket taxpayer than outright taxable payments of an equivalent amount. We think it quite likely that a taxpayer in Dr. Pacella's position would value the tax deferral of roughly $20,000 in pension plan contributions a year at $6,000 or $7,000, and, consequently, would have accepted employment with an uncontrolled corporation at such a lower salary.

Since we conclude that Dr. Pacella's compensation from the P.C. reflects rather closely the amount of compensation he would have sought for his services from an unrelated entity, we reject respondent's section 482 allocation as being arbitrary and capricious. *Ballentine Motor Co. v. Commissioner, supra.*

Respondent's next argument is that if we decline to allocate all the P.C.'s income to Dr. Pacella under section 482, we at least under that section must deny Regent Hospital any deductions for paying the P.C. for Dr. Pacella's treatment of hospital inpatients. Allowing Regent Hospital, Dr. Pacella's sole proprietorship, to take a deduction for receiving Dr. Pacella's services, contends respondent, merely allows Dr. Pacella to "gross up" the amount of P.C. income, and, indirectly, the tax-deferred pension plan contributions.

It is clear from the record that Regent Hospital and the P.C. constitute separate trades or businesses owned or controlled by the same interests (i.e., Dr. Pacella) within the meaning of section 482. It is also clear from the record that Dr. Pacella had an exclusive employment contract with the P.C. in regard to the doctor's professional services. Dr. Pacella was rightfully concerned that a failure to observe the terms of such an exclusive employment contract could seriously jeopardize the tax benefits he sought from the creation of the P.C. See *Keller v. Commissioner, supra* at 1032; *Foglesong v. Commissioner, supra; Roubik v. Commissioner,* 53 T.C. 365 (1969); *Rubin v. Commissioner,* 51 T.C. 251, 265–266 (1968), revd. and remanded on this point 429 F.2d 650 (2d Cir. 1970), on remand 56 T.C. 1155 (1971), affd. 460 F.2d 1216 (2d Cir. 1972).

In an attempt to comply with the term of his contract with

the P.C., Dr. Pacella terminated his uncompensated treatment of inpatients at Regent Hospital and informed Regent Hospital that should it desire his services in the future, they could be obtained only through his P.C.[7] The P.C. and Regent Hospital then agreed that the P.C. should be paid $55 per hour for any treatment of inpatients by Dr. Pacella which the hospital required.

Prior to incorporation, Dr. Pacella's medical services could be obtained by private individuals at a cost of anywhere from $35 to $75 per hour. The $55 figure arrived at for Dr. Pacella's services between the P.C. and Regent Hospital, therefore, we think reflects an arm's-length arrangement between those two businesses. Accordingly, we hold that respondent's denial of deductions to Regent Hospital for its payments to the P.C. for Dr. Pacella's services was arbitrary and capricious. The disputed amounts were properly deducted by the hospital and included in the P.C.'s reported income during the years at issue.

Respondent's final argument is that the income of the P.C. must be completely reallocated to Dr. Pacella under section 61's "assignment of income" principles. We have found that during the years at issue, the P.C. was a valid corporation whose separate status was, for the most part, carefully respected. Through its contract with Dr. Pacella, the P.C. possessed the actual power to control the receipt of funds for the clinical services he performed. *Keller v. Commissioner*, *supra* at 1032. The corporation carried on the business of providing psychiatric treatment services, through its employees, both to Regent Hospital and to individual patients during those years. Under such circumstances, we find the application of the assignment of income doctrine inappropriate in this case.

Due to concessions of the parties,

*Decision will be entered under Rule 155.*

---

[7]Respondent attempts to make much of the fact that Dr. Pacella did not in addition terminate his salaried employment with Roosevelt Hospital and the New York City Transit Authority during the years at issue. Dr. Pacella's services to those organizations, however, were not of a clinical nature and consequently appear not to be prohibited by Dr. Pacella's employment contract.