GARY A. SARGENT AND JANICE B. SARGENT, ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 7386-86, 11170-88, 11290-88.      Filed November 13, 1989.

*John W. Hughes,* for the petitioners.
*Sharon Katz-Pearlman* and *William R. Davis, Jr.,* for the respondent.

[1]The following cases are consolidated herewith: Steven M. Christoff and Tami Jo Christoff, docket No. 11170-88; and Steven M. Christoff, docket No. 11290-88.

TANNENWALD, *Judge:* This is the lead case in the Minnesota North Stars Litigation Project.[2] Respondent determined the following deficiencies in petitioners' Federal income taxes:

| Petitioner | Year | Deficiency |
|---|---|---|
| Gary A. Sargent and | 1978 | $14,577.74 |
| Janice B. Sargent | 1979 | 18,041.24 |
| | 1980 | 18,852.04 |
| | 1981 | 27,882.96 |
| Steven M. Christoff | 1980 | 21,798.00 |
| Steven M. Christoff and | 1981 | 23,118.35 |
| Tami Jo Christoff | 1982 | 519.24 |

After concessions, the sole issue for decision is whether petitioners are subject to tax on amounts paid to their wholly owned personal service corporations on account of services rendered by them to the Minnesota North Stars hockey team.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

Petitioners Gary and Janice Sargent maintained their legal residence in Burnsville, Minnesota, at the time of the filing of their petition herein. They filed joint Federal income tax returns for the years in issue with the Internal Revenue Service Center, Holtsville, New York.

Petitioners Steven M. and Tami Jo Christoff maintained their legal residence in Bloomington, Minnesota, at the time of the filing of their petitions herein. Steven Christoff filed his individual Federal income tax return for 1980 with the Internal Revenue Service Center, Ogden, Utah, and the Christoffs filed a joint return for 1981 and 1982 with the same service center.

All further references to petitioner Sargent are to Gary A. Sargent, and all further references to petitioner Christoff are to Steven M. Christoff. All further references to petitioners are to Gary A. Sargent and Steven M. Christoff.

During the years in issue, Sargent and Christoff were professional hockey players. After graduation from college in 1976, Sargent was drafted by the Los Angeles Kings

---

[2]Petitioners in docket Nos. 8821-87, 10976-87, 7131-88, 8490-88, and 17373-88 have agreed to be bound by the outcome of this case.

(Kings). After playing for the Kings, Sargent sought the assistance of Arthur Kaminsky, an attorney, concerning the benefits of incorporation. Mr. Kaminsky advised Sargent that the benefits of incorporation included increased bargaining power and the possibility of placing money into a pension plan. Based upon his consultations with Mr. Kaminsky, Sargent incorporated Chiefy-Cat, Inc. (Chiefy-Cat) on July 20, 1978. Sargent was the sole shareholder, president, and sole director of Chiefy-Cat. On July 1, 1978, Sargent entered into an employment contract (employment contract) with Chiefy-Cat wherein he agreed to perform services as a professional hockey player and consultant exclusively for Chiefy-Cat for the period July 1, 1978, to June 30, 1984. On July 1, 1978, Chiefy-Cat entered into a memorandum of agreement (memorandum of agreement) with the Northstar Hockey Partnership (Club) wherein Chiefy-Cat agreed, among other things, to furnish the services of Sargent as a hockey player and consultant to the Club and, in exchange, the Club agreed to pay and paid to Chiefy-Cat $85,000 during the 1978 playing season (July 1978—June 1979), $115,000 during the 1979 season (July 1979—June 1980), $120,000 during the 1980 season (July 1980—June 1981), and $130,000 during the 1981 season (July 1981—June 1982). Also on July 1, 1978, the Club, Chiefy-Cat, and Sargent entered into an agreement (guarantee) whereby Chiefy-Cat represented to the Club that, by virtue of its contractual agreement with Sargent, it had the right to cause Sargent to perform services on its behalf and that it would cause Sargent to perform his services in order to enable it to fulfill its contractual obligation to the Club. Sargent guaranteed to the Club the performance of all obligations of Chiefy-Cat to the Club.

The employment contract provided that Chiefy-Cat agreed to pay Sargent $60,000 during the first year and $95,000 for each succeeding year. Chiefy-Cat withheld and paid the applicable Federal and State income taxes, employment and unemployment taxes, and timely filed Employers Quarterly Federal Tax Returns and Forms W-2 and W-3.

On March 5, 1980, respondent issued a letter whereby a pension plan established by Chiefy-Cat and covering Sargent was determined to be a qualified pension plan. Such

favorable determination is still in effect. Chiefy-Cat made the following contributions to the plan:

| Year | Contribution |
| --- | --- |
| 07/78—05/31/79 | $20,893 |
| 06/01/79—05/31/80 | 24,675 |
| 06/01/80—05/31/81 | 27,099 |
| 06/01/81—05/31/82 | 27,749 |

In 1983, Sargent executed, in his individual capacity, the necessary forms to be placed on the voluntarily retired list of the Club.

On February 27, 1980, Christoff individually entered into a contract to play hockey for the Club during the 1979-80 through the 1982-83 seasons. That contract provided for a signing bonus of $35,000, payable $27,500 upon signing and $7,500 on October 15, 1980.

On August 11, 1980, based upon consultation with Mr. Kaminsky, Christoff incorporated RIF Enterprises, Inc. (RIF). Christoff was the sole shareholder, president, and sole director of RIF. The primary purposes of incorporation were the same as those which motivated Sargent (see page 574, *supra*). On August 11, 1980, Christoff also entered into an employment agreement (employment agreement) with RIF wherein he agreed to render services exclusively to RIF as a hockey player and consultant during the period August 11, 1980, to September 30, 1985. A similar agreement was executed on October 15, 1980, in which RIF agreed to pay Christoff $45,000 for the first year and $50,000 for the second year of the agreement.[3] On October 15, 1980, the Club and RIF entered into a memorandum of agreement (memorandum of agreement) wherein, among other things, the Club engaged RIF to provide the services of Christoff as a hockey player, and RIF agreed, among other things, to provide the services of Christoff to the Club. In exchange,

---

[3]This agreement makes no reference to the Aug. 11, 1980, agreement, and the copy of record has a blank for the beginning date of the term. We infer, however, that such date was Aug. 11, 1980, and that this agreement simply fixed the payments to Christoff for his services during the first 2 years, leaving the Aug. 11, 1980, agreement to take effect after the expiration of the 2-year period. The vagaries revealed by the foregoing do not materially impact on our reasoning or conclusions herein. We also note that unlike the situation with respect to Sargent (see page 574 *supra*), the record is incomplete with respect to Christoff as to the withholding and payment of income and employment and unemployment taxes. Here again, we do not consider this factor to have a material impact on our reasoning or conclusions herein.

the Club agreed to pay RIF $63,500 during the 1980 season (July 1980—June 1981) and $71,500 during the 1981 season (July 1981—June 1982). Also on October 15, 1980, the Club, RIF, and Christoff entered into an agreement (guarantee) whereby RIF represented to the Club that, by virtue of its contractual agreement with its employee, Christoff, it had the right to cause Christoff to perform services on behalf of RIF and that it would cause Christoff to perform his services in order to fulfill its contractual obligation to the Club, and Christoff guaranteed to the Club the due performance of all obligations of RIF to the Club. On December 2, 1980, the Club, RIF, and Christoff entered into a further agreement containing additional provisions indemnifying the Club against any income, withholding, or other taxes relating to payments by the Club to RIF pursuant to the memorandum of agreement, which taxes RIF agreed to pay.

On September 1, 1981, respondent issued a letter whereby a pension plan established by RIF and covering Christoff was determined to be a qualified pension plan. Such favorable determination is still in effect. RIF made the following contributions to the plan:

| Year | Contribution |
|------|-------------|
| 08/11/80—05/31/81 | $7,200 |
| 06/01/81—05/31/82 | 17,750[4] |
| 06/01/82—05/31/83 | 1,625 |

In 1982, Christoff was traded by the Club to the Calgary Flames Hockey Club (the Flames). Christoff played for the Flames as an individual and not on behalf of any corporation. The Flames would not recognize RIF as an entity. In the summer of 1983, Christoff was released from the Flames, briefly returned to the North Stars, and was subsequently traded to the Los Angeles Kings where he played again as an individual.

During the years at issue, neither Sargent nor Christoff were considered employees of the Club for purposes of the National Hockey League Players' Pension Plan, but the Club paid Chiefy-Cat and RIF, respectively, the amounts that it would otherwise have contributed to the plan on

---

[4]RIF's tax return shows the deduction on line 23 of Form 1120 (Advertising), but it is obvious that this is an inadvertent error.

their behalf. There was no requirement that either Chiefy-Cat or RIF pay over these amounts to its pension plan.[5]

Each memorandum of agreement gave the Club the right to sell, transfer or assign, or loan out the services of Sargent and Christoff, respectively.

Each memorandum of agreement provided that Sargent and Christoff, respectively, would not, without the Club's consent, engage in any other athletic sport nor make any public appearances, sponsorships, etc., relating to the services performed for the Club.

The Club provided Sargent and Christoff with uniforms and hockey equipment during the years in issue.

As between the Club and petitioners, the Club controlled the scheduling of the games in which the Minnesota North Stars team would play. During a game, the coach of the Club had the responsibility of deciding which players would play and for how long and the strategy of play. The coach was also responsible for conducting the practices which the players were required to attend. Training camps were held by the Club and were run by the coach with the assistance of the general manager. If a player with a contract failed to show up at training camp, he could be fined pursuant to the NHL rules.

OPINION

The issue before us is the taxability of sums earned through the performance of personal services as between the individual who performed the services and the personal service corporation created by that individual. In the instant case, these services were performed for an unrelated third party.

There have been numerous decisions resolving this issue in the context of whether the personal service corporation should be recognized for tax purposes or whether the assignment of income doctrine under section 61[6] or the

---

[5]The record is not complete in respect of the details of the year-to-year treatment of Sargent and Christoff in respect of payments to the National Hockey League Players' Pension Plan, but we are satisfied that the above finding is substantially correct and, in any event, such lack of complete details as exists does not have a material impact on our reasoning or conclusions herein.

[6]All section references are to the Internal Revenue Code as amended and in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

allocation provisions of section 482 should be applied. Respondent herein does not question the tax viability of Chiefy-Cat or RIF. Respondent does not challenge the validity of the Chiefy-Cat and RIF pension plans and has, for reasons not revealed by the record, allowed the contributions to these plans in the course of settling the income tax cases of those corporations. Respondent argues that, by virtue of the common law rules for determining the existence of an employer-employee relationship, Sargent and Christoff were employees of the Club and not Chiefy-Cat and RIF, respectively, and that, such being the case, the amounts which Chiefy-Cat and RIF received from the Club for their services should be taxable to petitioners under section 61 or section 482. Petitioners, of course, argue that they were employees of Chiefy-Cat and RIF, respectively, and not of the Club and that, in any event, neither section 61 nor section 482 applies. For the reasons hereinafter set forth, we agree with respondent.

Whether petitioners were employees of the Club or of their respective personal service corporations is an issue comparable to that which usually arises in connection with determining whether an individual is an employee or an independent contractor rather than, as is the case herein, who is the employer of a conceded employee. Nevertheless, the former category of cases provides us with guidance in determining who is the employer—a question to be resolved on the basis of all the facts and circumstances involved. See *Professional & Executive Leasing, Inc. v. Commissioner*, 89 T.C. 225, 232-233 (1987), affd. 862 F.2d 751 (9th Cir. 1988), wherein we stated:

Although no one factor is controlling, the test usually considered fundamental is "whether the person for whom the work is performed has the right to control the activities of the individuals whose status is in issue, not only as to results but also as to the means and method to be used for accomplishing the result." [Citations omitted.]

The thrust of respondent's position focuses on this issue of control. Respondent asserts that the situation herein is drastically different from that of other professions and that—

the very nature of a hockey player's position as a member of a team, renders impossible the relationship which petitioners seek to establish between themselves and their corporations. * * *

*       *       *       *       *       *       *

* * * the very nature of the hockey profession, and membership as a player on a professional team, militates strongly in favor of a finding that the petitioners' salaries from hockey playing were earned while engaged in an employment relationship with the Club. Petitioners' team membership required that the petitioners abide by the rules and regulations of the Club, and they were required, by the very nature of their relationship with the Club, to submit to the guidance and control of the coach. There was simply no real employment relationship between the corporation and the petitioners within which petitioners could have earned the salary incomes.[7]

Petitioners argue that each of them, by virtue of his talents, retained control of how he should play to accomplish the strategy developed by the coach during training camp, practice, and actual game play in which he is required to participate. Retention of such control is sufficient, according to petitioners, to permit them, under the facts and circumstances herein, to take advantage of the use of a personal service corporation on whose behalf they exercise that control in accordance with the principles articulated in *Johnson v. Commissioner*, 78 T.C. 882, 890 (1982), affd. without published opinion 734 F.2d 20 (9th Cir. 1984); *Pacella v. Commissioner*, 78 T.C. 604 (1982); and *Keller v. Commissioner*, 77 T.C. 1014 (1981) (Court reviewed), affd. 723 F.2d 58 (10th Cir. 1983). In short, petitioners contend that the same frame of reference should apply to their situation as would be applicable to a player of individual sports. We disagree.

We think that the nature of team sports is a critical element which must be taken into account in determining the existence of an employer-employee relationship in accordance with common law principles. Coaching, even in respect of professionals, involves instruction and direction on fundamental techniques, game tactics, and strategy. Coaches and managers determine when, if, and how long a

---

[7]While respondent's argument deals with salary, in point of fact, with the exception of a portion of Christoff's sign-on bonus (see page 583, *infra*), the amounts at issue relate to the contributions of Chiefy-Cat and RIF to their pension plans on behalf of petitioners. In any event, there is no disagreement between the parties as to the amounts taxable to Sargent and Christoff individually to the extent that respondent's determinations are sustained.

player will play and in what position. A player's activities are directed and modified by a coach or manager so as to mesh properly with the activities of other players on the same team. Each player on a team is normally given a specific assignment regarding position on the field of play and specific responsibility for achieving the team goal. The assignments and instructions are subject to instantaneous change by the coach to meet the ebb and flow of a game. A player's game activities are typically scrutinized and changes are frequently made with respect to a player's activities depending upon the opponent. Coaches scrutinize and direct a player in even the smallest details, in order to achieve a slight edge over the opposition.

Concededly, a team player may have talents that make up a player's package of basic athletic skills. However, other than those skills normally associated with hand-eye-foot coordination, a team player retains the power to determine what he is to do in relationship to the team only in those situations where the player's determination coincides with the game plan of his coach or manager. Would any coach tolerate a player who individually determined that he was personally going to score all of the points for his team and never pass to another player? Could a team coach tolerate a player who disobeyed instructions as to how a particular play should be carried out? Would a coach tolerate a player whose actions consistently caused his team to be penalized? The answer to these questions is clear. We are satisfied that the nature of the team sport of hockey involves a high level of control over player activity by coaches and managers and that such control cannot simply be ignored or disguised as mere strategy.

In sum, we hold that Sargent and Christoff were employees of the Club and not of their personal service corporations. None of the previously decided cases, relied upon by petitioners, require a different conclusion. *Johnson v. Commissioner, supra; Pacella v. Commissioner, supra; Keller v. Commissioner, supra;* all involved issues relating to the separate validity of the personal service corporations, and/or the applicability of sections 61 and 482, and not the issue of

who was the employer.[8] The same is true of our earlier decisions in *Laughton v. Commissioner,* 40 B.T.A. 101 (1939), remanded for an unrelated reason 113 F.2d 103 (9th Cir. 1940), and *Fox v. Commissioner,* 37 B.T.A. 271 (1938), and of our recent decision in *Haag v. Commissioner,* 88 T.C. 604 (1987), affd. without published opinion 855 F.2d 855 (8th Cir. 1988). See also *Achiro v. Commissioner,* 77 T.C. 881, 902 n. 27 (1981). In point of fact, the only case which addresses the latter issue is *Professional & Executive Leasing, Inc. v. Commissioner, supra,* and our conclusion herein is consistent with that which we reached in that case.

Nor are we impressed with petitioners' argument that respondent's position should be rejected on the ground that the application of section 530 of the Revenue Act of 1978, Pub. L. 95-600, 92 Stat. 2885, supports petitioners' position because respondent recognized the validity of the contracts between the Club and their personal service corporations by settling two cases involving other players for the Club. In enacting that statute, Congress was dealing with the freezing of respondent's position on the existence of an employer-employee relationship *in the employment tax arena* and there is simply no evidence that it was intended to have any effect for income tax purposes. Similarly, we reject petitioners' assertion that we should accord weight to the fact that respondent has allowed deductions of contributions to the pension plans of Chiefy-Cat and RIF (see page 578, *supra*), on the ground that such action necessarily carries the implication that petitioners are employees of their personal service corporation. Both of these arguments bear the mark of an assertion of estoppel against the Government—an assertion that must fail because the necessary elements are not present. *Boulez v. Commissioner,* 76 T.C. 209, 214-216 (1981), affd. 810 F.2d 209 (D.C. Cir. 1987).

Having concluded that Sargent and Christoff were employees of the Club, we now address respondent's contention that the amounts paid to their personal service corporations by the Club are taxable to them by virtue of section 61 and section 482. Petitioners assert that the same authorities which they claimed supported their position that

---

[8]In point of fact, we held in *Fox v. Commissioner,* 37 B.T.A. 271, 273 (1938), that property and not personal services were involved.

they were employees of their personal service corporations (page 579, *supra*) require the conclusion that neither section 61 nor section 482 applies. The lead case is *Keller v. Commissioner, supra.*

In *Keller v. Commissioner, supra,* we held that, where the personal service corporation had a recognized separate existence and there were clearly established and observed arrangements between the entities and individual involved, the entire income of that corporation could not be allocated to the taxpayer-shareholder, even though the purpose of forming the corporation was to obtain tax benefits, such as the ability to make deductible contributions to a pension plan. 77 T.C. at 1029-1030. We further held that respondent could not allocate even a portion of the corporation's income where, as appears to be the case herein, see note 7, *supra,* the amounts which the taxpayer-shareholder received, either directly, or by way of payments for his benefit, i.e., as contributions to the Chiefy-Cat and RIF pension plans, approximately equaled what he would have received had he bargained directly with the unrelated party payor. 77 T.C. at 1025. As a backdrop for our reasoning, we pointed to the legislative policy of "deliberate congressional bestowal of benefits" on qualified retirement plans. 77 T.C. at 1030.

We followed the approach of *Keller* in *Pacella v. Commissioner,* 78 T.C. at 618-621, and *Haag v. Commissioner,* 88 T.C. at 614-615, 621-622. We are of the opinion, however, that this approach has no bearing on the instant case. In these cases, we proceeded on the basis that the taxpayers were employees of their personal service corporations. See *Haag v. Commissioner,* 88 T.C. at 611-612; *Pacella v. Commissioner,* 78 T.C. at 618; *Keller v. Commissioner,* 77 T.C. at 1024. The same is true of *Johnson v. Commissioner, supra,* where we set forth the requirement of an employer-employee relationship between the taxpayer and his personal service corporation and assumed arguendo the existence of such a relationship. 78 T.C. at 891-892. And we are satisfied that *Laughton v. Commissioner, supra,* and *Fox v. Commissioner, supra,* were based upon the same assumption

since as we have already pointed out (see page 581, *supra*), the issue of who was the employer was not addressed.[9]

In light of our determination that an employment relationship between petitioners and their personal service corporation is lacking, neither the cases previously discussed nor the legislative policy background involved require us to limit the application of section 482 or the assignment of income doctrine under section 61.

The long and short of the matter is that we conclude that the instant case is a classic situation for the application of the assignment of income doctrine articulated in *Lucas v. Earl*, 281 U.S. 111 (1930), and its progeny, and that the amounts received by Chiefy-Cat and RIF, respectively, for services rendered by petitioners to the Club should be includable in their income under section 61. See also *United States v. Basye*, 410 U.S. 441 (1973). Indeed, we would reach the same result by applying section 482. Thus, we need not choose between the two approaches. See *Keller v. Commissioner*, 77 T.C. at 1033.[10]

One final word with respect to the second installment of Christoff's sign-on bonus in the amount of $7,500. Christoff contends that, because the amount was not payable until after the date on which the contract for his services between the Club and RIF was signed, it should not be taxable to him individually. The fact is that it was a part of a bonus which the Club agreed to pay Christoff for signing a contract with it in his individual capacity. It was earned by Christoff solely by his act of signing, and the fact that it was subsequently paid to RIF in no way relieves him from having it taxed to him individually. *Helvering v. Eubank*, 311 U.S. 122 (1940); *Keller v. Commissioner*, 77 T.C. at 1033. That amount is, irrespective of any other considerations, includable in his income.

---

[9]In this context, petitioners' attempt to limit the impact of fn. 21 (*Keller v. Commissioner*, 77 T.C. at 1033) is without merit. We also note that both *Laughton v. Commissioner*, 40 B.T.A. 101 (1939), remanded 113 F.2d 103 (9th Cir. 1940), and *Fox v. Commissioner*, 37 B.T.A. 271 (1938), involved situations where the taxpayer was "loaned out" by his corporation to several third parties. Moreover, as we have previously noted, see note 8, *supra*, *Fox v. Commissioner, supra*, held that property, and not personal services, was involved.

[10]We note that Congress has dealt with some of the issues involved in this case by enacting sec. 269A, applicable to taxable years commencing after Dec. 31, 1982.

In order to reflect our conclusions herein and the concessions of the parties,

*Decisions will be entered under Rule 155.*

Reviewed by the Court.

CHABOT, PARKER, COHEN, SWIFT, JACOBS, GERBER, WRIGHT, PARR, WILLIAMS, RUWE, WHALEN, and COLVIN, *JJ.*, agree with the majority opinion.

WELLS, *J.*, dissenting: The majority has brushed aside our precedent for determining when income should be reallocated from a personal service corporation (PSC) to its sole service-performer and in so doing has adopted a new test. While characterizing the instant case as "a classic situation for the application of the assignment of income doctrine," the majority, by relying upon *Professional & Executive Leasing, Inc. v. Commissioner,* 89 T.C. 225 (1987), affd. 862 F.2d 751 (9th Cir. 1988), imports authorities from the qualified plan and employment tax areas to decide the issue. Because the majority fails to follow the approach we have taken in recent decisions involving situations nearly identical to that presented in the instant case, I must dissent.

I submit that the analysis of whether income should be reallocated between a corporation and its sole service-performer should be made in accordance with *Haag v. Commissioner,* 88 T.C. 604 (1987), affd. without published opinion 855 F.2d 855 (8th Cir. 1988); *Johnson v. Commissioner,* 78 T.C. 882 (1982), affd. without published opinion 734 F.2d 20 (9th Cir. 1984), cert. denied 469 U.S. 857 (1984); *Pacella v. Commissioner,* 78 T.C. 604, 618-619 (1982); and *Keller v. Commissioner,* 77 T.C. 1014 (1981), affd. 723 F.2d 58 (10th Cir. 1983).[1]

In *Johnson v. Commissioner, supra,* we considered a situation in which a professional "team player," more specifically, a basketball player, assigned the rights to his services and payment therefor to certain corporations in exchange for fixed monthly fees. In analyzing that situation, we set forth "the two requirements that must be met

---

[1]*Dahlberg v. Commissioner,* T.C. Memo. 1989-551; *Willett v. Commissioner,* T.C. Memo. 1988-439.

employee, will be considered the controller of the income and taxable thereon." *Haag v. Commissioner, supra* at 611. Those requirements are:

(1) The service-performer employee must be an employee of the corporation whom the corporation has the right to direct or control in some meaningful way; and

(2) there must exist between the corporation and the person or entity using the services a contract or similar indicium recognizing the corporation's controlling position. [*Johnson v. Commissioner, supra* at 891.]

The majority's analysis in the instant case renders the first requirement of *Johnson* a nullity in the very context in which it was articulated—namely, that of team sports. In *Johnson,* we assumed *arguendo* that a basketball player's contractual arrangement with a corporation satisfied the first requirement of *Johnson,* thus conveying the impression that a team player could potentially meet such a requirement. 78 T.C. at 891-892. The majority, however, without directly confronting the issue, now appears to conclude that a team player and his PSC can *never,* as a matter of law, satisfy the first requirement of *Johnson.* Such a conclusion runs contrary to our statement in *Johnson* that:

the realities of the business world prevent an overly simplistic application of the *Lucas v. Earl* rule whereby the true earner may be identified by merely pointing to the one actually turning the spade or dribbling the ball. * * * that test may easily become sheer sophistry when the "who" choices are a corporation or its employee. [78 T.C. at 891. Fn. ref. omitted.]

The recognition of the "tension" between the nature of the corporate business form (i.e., *Moline Properties v. Commissioner,* 319 U.S. 436 (1943)) and assignment of income notions (i.e., *Lucas v. Earl,* 281 U.S. 111 (1930)), which tension is "most acute" in the context of a PSC, is the foundation and framework of the *Johnson* analysis. In *Johnson,* we specifically pointed out the "inherent impossibility of logical application of a per se actual earner test." *Johnson v. Commissioner,* 78 T.C. at 890-891.

Our recent opinion in *Haag v. Commissioner, supra,* which analyzed the *Johnson* requirements, confirms that the first requirement of *Johnson* must be interpreted in recognition of the tension between *Moline Properties* and *Lucas v. Earl.*

In *Haag,* we held that a doctor was "an employee" of his PSC over whom the PSC could "exercise control in a meaningful sense," thus satisfying the first requirement of *Johnson.* The PSC in *Haag* was in the business of providing services as a partner in a medical partnership. In reaching our conclusion in *Haag,* we quoted the provisions of the employment contract between the doctor and his PSC under which the PSC employed the doctor "to perform professional services on behalf of the Corporation" and under which the doctor agreed to "devote his entire time, attention, knowledge and skill to such employment."

We then stated:

Respondent contends that this agreement did not give the [PSC] any real control over petitioner's services because, as the [PSC's] sole director and one of only two shareholders (the other being the ESOP), petitioner could modify or rescind the agreement or could, and did, ignore it. We find respondent's argument to be without merit. There is nothing in the record to indicate that petitioner ignored the employment agreement. The ability of a majority or sole shareholder to ignore, rescind, or modify an agreement entered into with his corporation exists in every closely held corporation. A holding that such ability precludes a corporation from exercising control over its employee's earning of income, and thus being taxable on that income, would violate the longstanding recognition of corporations as entities independent of their shareholders. See *Moline Properties, Inc. v. Commissioner,* 319 U.S. 436, 438-439 (1943). [88 T.C. at 612.]

The foregoing quote makes apparent the majority's mischaracterization of *Haag* as a case in which "we proceeded on the basis that the taxpayers were employees of their personal service corporations" (Majority opinion at 582). In the instant case, as in *Haag,* the contracts between petitioners and their PSCs grant the PSCs the right to control petitioners' services, and the majority in no way suggests that those contracts were ignored by petitioners. *Haag* was affirmed by the Eighth Circuit, the Circuit to which venue for appeal of the instant case lies. Absent the finding of a sham, the *Keller—Johnson—Haag* line of cases requires that petitioners' employment agreements with their PSCs should not be completely disregarded.

Moreover, where an employment contract exists between the service-performer individual and the PSC, and a second contract exists between the PSC and a third-party service-

recipient, how can it be said that the service-performer individual is the "employee" of the third-party? As we have previously stated, in *Achiro v. Commissioner,* 77 T.C. 881, 902 (1981), the only way to reach such a conclusion is to disregard the contracts. The majority does just that, in essence treating the arrangement provided for by the agreements as a sham, without making such a finding.

There is good reason why the majority shies away from analyzing the arrangement as a sham. In *Keller,* we stated:

The business of [the PSC] is that of providing pathology services as a partner of [the medical partnership]. The corporation employs petitioner to perform the requisite services. Petitioner, in turn, is in the business of providing services as an employee of his wholly owned corporation. * * * The patent artificiality of the corporate fiction is strikingly illustrated when there is a business activity which could be conducted by the corporation's sole shareholder outside of the corporation. Nonetheless, this conceptual analysis is mandated by the policy that corporations be recognized, apart from their shareholders, regardless of their size. *Moline Properties, Inc. v. Commissioner,* 319 U.S. 436 (1943). [77 T.C. at 1024. Fn. ref. omitted.]

The foregoing quotation from *Keller* is followed by a footnote explaining that a corporation may be ignored under *Moline Properties* if it is "so unreal as to constitute a 'bald and mischievous fiction,' " and noting that respondent did not argue that the corporation in *Keller* was a sham. 77 T.C. at 1024, n. 8. Similarly, in the instant case, the majority states that respondent has not questioned the tax viability of Chiefy-Cat or RIF.[2] Nevertheless, its holding effectively renders those corporations nullities for Federal income tax purposes.

The majority disregards the separateness of the PSC's by analyzing the issue in the framework of whether petitioners are "common-law employees" of the Club.[3] Even though the agreements in the instant case were apparently the subject

[2]It should also be noted that fn. 7 and the accompanying text of the majority opinion indicate that respondent's main dispute here is over the pension plan contribution. If that is respondent's complaint, he should have challenged the qualified status of the plan. Respondent must have recognized, however, that we would be unwilling to disregard the existence of the PSC's or to allocate all of the PSC's income to petitioners on the ground that the PSC's were formed for the principal purpose of securing the tax benefits of retirement plans. *Achiro v. Commissioner,* 77 T.C. 881, 892-903 (1981); *Keller v. Commissioner,* 77 T.C. 1014, 1029-1030 (1981), affd. 723 F.2d 58 (10th Cir. 1983).

[3]See *Rubin v. Commissioner,* 429 F.2d 650 (2d Cir. 1970), reversing and remanding 51 T.C. 251 (1968).

of arms-length negotiations, the majority fails to analyze whether, under those agreements, the Club gave up its right to "common-law" control of the petitioners. Indeed, it appears that the Club agreed to deal with petitioners only pursuant to the contractual arrangements provided under the agreements. Although the majority purports to decide merely whether petitioners were the "employees" of their PSC's, the distinction between finding that petitioners were *not* the PSC's employees, and disregarding the existence of the PSC's entirely, is "largely semantic rather than substantive." *Keller v. Commissioner, supra* at 1030-1031.

The logical outgrowth of the majority's unique analysis is that only "traditional" independent contractors (i.e., those over whom service-recipients do not exercise "control") can avail themselves of PSC's while "traditional" employees cannot. Such a rule, while perhaps appealing from the standpoint of predictability,[4] finds no meaningful support in our precedent. We should not create new tests for their predictability, policy value, or other appeal. That role should be left to Congress, which can forge new law unconstrained by stare decisis. Congress responded to *Keller* when it enacted section 269A. H. Rept. 97-760 (Conf.), pages 633-634 (1982), 1982-2 C.B. 600, 679-680. In forging that provision, Congress did not resort to an analysis of control, but instead gave the Secretary of the Treasury broad powers to reallocate income under certain specified circumstances. Indeed, the majority's new "judicial cure" may well go beyond the legislative remedy contained in section 269A. The new test adopted by the majority adds confusion to the law by making "control" the lynchpin of its holding. The majority's action today reminds me of the admonition of the Seventh Circuit in *Fogelsong v. Commissioner,* 621 F.2d 865, 872 (7th Cir. 1980),[5] that "there is no need to crack walnuts with a sledgehammer."

---

[4]See Banoff, "Reducing the Income Tax Burden of Professional Persons by Use of Corporations, Joint Ventures, Subpartnerships, and Trusts," 58 TAXES 968, 984-985 (1980). Respondent appears to have adopted the reasoning from Mr. Banoff's article in framing his litigation position for the instant case. See General Counsel Memorandum 39553 (Sept. 3, 1986).

[5]Reversing and remanding T.C. Memo. 1976-294, on remand *Fogelsong v. Commissioner,* 77 T.C. 1102 (1981), revd. 691 F.2d 848 (7th Cir. 1982).

NIMS, KÖRNER, SHIELDS, HAMBLEN, and CLAPP, *JJ.*, agree with this dissent.