RICHARD GORDON, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Gordon
Docket No. 16699-84
United States Tax Court
T.C. Memo 1993-10; 1993 Tax Ct. Memo LEXIS 11; 65 T.C.M. (CCH) 1721; January 11, 1993, Filed *11 Decision will be entered for respondent. For Petitioner: Gregory A. Robinson and Karen S. Kingzett. For Respondent: Mark S. Pendery. WHALEN
WHALEN
MEMORANDUM FINDINGS OF FACT AND OPINION WHALEN, Judge: Respondent determined the following deficiencies in, and additions to, petitioner's Federal income tax: Addition to Tax
Year
Deficiency
Sec. 6653(b)
1974
$ 73,240.04
$ 37,141.52
1975
74,083.87
36,520.44 All section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. After concessions by petitioner, the issues for decision in this case are: (1) Whether petitioner or his wholly owned corporation earned a finder's fee which was paid partially in 1974 and partially in 1975, and (2) whether petitioner is collaterally estopped from denying that he earned the finder's fee by virtue of his conviction under section 7201 for wilfully attempting to evade or defeat his individual income tax for 1974 and 1975. Petitioner concedes that his tax evasion conviction collaterally estops him from disputing the addition to tax for fraud under section 6653, in relation to any *12 deficiency which the Court finds. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The Stipulation of Facts and exhibits attached thereto are incorporated herein by this reference. Petitioner resided in Nevada at the time the petition in this case was filed. In December 1969, petitioner incorporated Luxury Rental and Leasing, Inc., a Nevada corporation (Luxury), for the principal purpose of leasing so-called exotic cars. Luxury also leased trucks, boats, and conventional automobiles. From 1969 through the years in question, petitioner was a full-time employee of Luxury, a member of its board of directors, and its president. Luxury's Federal income tax returns for the years 1970 through and including 1972 each state that petitioner owned 76 percent of Luxury's stock. The record of this case does not reveal the identity of the person or persons who owned the remaining 24 percent of Luxury's stock during those years. Luxury's Federal income tax returns for the years 1973, 1974, and 1975 each state that petitioner owned 100 percent of the stock of the corporation. The parties have also stipulated that during 1974 and 1975 petitioner was the sole shareholder *13 of Luxury. Nevertheless, petitioner's personal financial statement dated September 30, 1974, under the category of other assets, lists "85% stock" of Luxury. The record does not explain this discrepancy. In 1972, Mr. Allen Glick or a corporation controlled by him, Saratoga Development Corp., acquired the Hacienda Hotel and Casino in Las Vegas. Petitioner became acquainted with Mr. Glick at that time due to the fact that Luxury was then leasing an automobile to the Hacienda. The two men developed both a business and a personal relationship with each other. In early 1974, petitioner and Mr. Glick considered buying an automobile leasing company in southern California, Ralph Williams Leasing (Williams Leasing). The leasing company was then undergoing reorganization under the bankruptcy laws. Because of his experience in the automobile leasing business, petitioner undertook to investigate the proposed acquisition. In that connection, he visited Williams Leasing and its creditors in southern California, and he examined the company's records. The acquisition was never consummated. Also in early 1974, Mr. Glick informed petitioner of his interest in acquiring other casino properties. *14 Petitioner told his long-time friend Mr. Todd Derlachter about Mr. Glick's interest and, in late February or early March 1974, petitioner introduced Mr. Derlachter to Mr. Glick. After discussions with Mr. Glick, Mr. Derlachter arranged a meeting in New York City between Mr. Glick and Mr. Delbert Coleman, the controlling shareholder of Recrion Corp. (Recrion), a corporation which owned the Stardust and Fremont Hotel-Casinos in Las Vegas. As a result of that meeting, in the summer of 1974, Mr. Glick, acting through a corporation which he had formed for the purpose, Argent Corp., made a successful tender offer for Recrion's stock. The tender offer was followed by the merger of Recrion into Argent Corp. which thereupon succeeded to the business and assets of Recrion, including ownership of the Stardust and the Fremont. Petitioner played no role in the Recrion deal beyond introducing Mr. Glick to Mr. Derlachter and attending several meetings between them. Before the deal closed, Mr. Derlachter and petitioner had orally agreed that they would share equally any finder's fee earned through their efforts. No mention was made of Luxury. Shortly thereafter, Mr. Derlachter informed Mr. *15 Glick of his agreement to share any finder's fee with petitioner. After the Recrion transaction was completed, Mr. Glick agreed to pay a finder's fee of approximately $ 421,000 to Mr. Derlachter. On August 31, 1974, Mr. Glick filed a Form 10-K with the Securities and Exchange Commission (SEC) explaining the details of the Recrion transaction. The filing mentioned the roles of Mr. Derlachter and petitioner in the deal and the fee paid to Mr. Derlachter, but it did not allude to any part that Luxury might have played. The Form 10-K states as follows: Registrant [Argent Corporation] agreed to pay a finder's fee to Mr. Todd Derlachter in the amount of $ 421,844 in connection with Registrant's acquisition of certain outstanding shares of Recrion stock. Although Mr. Derlachter originally indicated that he was the sole finder, Registrant was informed subsequently that Mr. Derlachter had agreed to pay part of his fee to Mr. Richard Gordon. Neither Registrant nor its parent, Allen R. Glick, has at any time had any contractual arrangement with, or obligation to, Mr. Gordon in respect to any finder's services or related activities. Registrant paid $ 321,844 to Mr. Derlachter on August *16 29, 1974. The balance of $ 100,000 is payable to him on or about the first anniversary of this initial payment.
At Mr. Glick's request, petitioner signed a letter dated September 1, 1974, acknowledging receipt of $ 210,922 from Mr. Derlachter and stating that he had been paid in full by Mr. Derlachter for his role in the Recrion transaction. The letter states as follows: Argent Corporation Las Vegas Hacienda
3950 Las Vegas Blvd., South Las Vegas, Nevada 89119 Mr. Todd Derlachter 35283 Beach Road San Clemente, California 92624 Dear Sirs: Receipt is hereby acknowledged of the sum of $ 210,922.00 from Todd Derlachter in full payment for all services rendered by the undersigned in assisting Mr. Derlachter in bringing together Delbert W. Coleman and members of his family and Allen R. Glick as agent for Argent Corporation, resulting in the execution of an Agreement of Purchase and Sale dated April 8, 1974 with respect to shares of Common Stock of Recrion Corporation. The undersigned represents that the payment acknowledged hereby was neither promised by nor the result of any agreement, arrangement or understanding between Argent Corporation, its officers, *17 directors or agents and the undersigned and was made pursuant to an arrangement between Mr. Derlachter and the undersigned. In connection with such payment, the undersigned agrees to indemnify Argent Corporation, its officers, directors, agents and sole shareholder against any and all costs, liabilities or expenses, including attorneys' fees, which may result, or in any manner be connected with, any claim by any person that the payment hereby acknowledged is improper or was caused by, made with the knowledge of, or was the result of any agreement, arrangement or understanding between Argent Corporation and the undersigned. Very truly yours, Richard Gordon
Significantly, no mention is made in the letter of any role played by Luxury. Mr. Derlachter paid petitioner's share of the finder's fee to him in installments. In August and September of 1974, Mr. Derlachter gave petitioner three cashier's checks totaling $ 148,000. Each of the checks was drawn to the order of "Richard Gordon". Two of the checks were drawn in the amount of $ 37,000, and the third was drawn in the amount of $ 74,000. Petitioner deposited one $ 37,000 cashier's check into his personal account at Nevada *18 State Bank (NSB). The second $ 37,000 cashier's check was processed at NSB. The record does not reveal the disposition of the proceeds of that check, but it is clear that they were not deposited into Luxury's corporate account at that bank. Petitioner took the third cashier's check, in the amount of $ 74,000, to the Valley Bank of Nevada (VBN) and converted it into cash, in the amount of $ 30,000, and into three other cashier's checks: two for $ 10,000 each, and one for $ 24,000. Petitioner took the three VBN cashier's checks to NSB where he cashed the two $ 10,000 checks and deposited the $ 24,000 check into his personal account. Circa the end of 1974, petitioner purchased all of the outstanding stock of Best Brands, Inc., a wholesale liquor distributorship located in Las Vegas, Nevada (Best Brands). Petitioner purchased the stock from Mr. Carl Bonas and his wife, Ms. Shirley Bonas. From that time through the end of 1975, petitioner was sole owner, director, and principal officer of Best Brands. As a liquor wholesaler and distributorship, Best Brands was obligated to comply with the audit and other standards set by the Bureau of Alcohol, Tobacco, and Firearms, as well as *19 those of State regulatory bodies. Accordingly, after he purchased Best Brands, petitioner hired an accounting firm which employed Mr. Albert Bardier, a certified public accountant, to handle his financial affairs and the financial affairs of his two corporations. Petitioner perceived that Mr. Bardier's accounting firm had greater expertise than the certified public accountant he formerly had employed. Prior to hiring Mr. Bardier in December 1974, Luxury did not maintain a set of books and records nor did it keep canceled checks, bank statements, or other supporting documents, such as invoices. Because petitioner had failed to keep adequate records for Luxury and had intermingled his personal finances with those of Luxury, Mr. Bardier was unable to determine which funds were personal and which were corporate. To reconstruct past transactions, Mr. Bardier had to consult with petitioner and obtain back records from financial institutions and suppliers. Despite the difficulties caused by petitioner's intermingling of corporate and personal financial affairs, petitioner continued the practice after he hired Mr. Bardier. Petitioner's personal financial statement dated September 30, *20 1974, lists as a personal asset "Notes receivable Argent $ 62,725". This receivable is the unpaid portion of the finder's fee from the Recrion deal discussed above. A "supplemental sheet" to the financial statement further describes the asset as "Notes Receivable -- Argent Corp. balance of fee on Reciron [sic] 62,725." Similarly, petitioner's personal financial statement dated August 31, 1975, lists, under the category notes receivable, "Argent Corp. $ 62,725." Neither financial statement states that the note receivable from Argent Corp. was payable to Luxury. The 1975 statement was prepared by Mr. Bardier. The record does not reveal the author of the 1974 statement. The record in this case suggests that the amount of the receivable on each of petitioner's financial statements should have been $ 62,500, rather than $ 62,725, and that the higher amount was used in error. In 1974, the SEC initiated an investigation of possible violations of the Federal securities laws by Recrion and/or Argent Corp. The SEC subpoenaed petitioner to testify regarding the Recrion deal on November 25, 1974. Petitioner was represented by an attorney. Petitioner testified under oath before an SEC *21 attorney who questioned him extensively regarding his role in the deal. The SEC attorney made it clear that the exact details of the transaction were highly important and that certain criminal penalties might apply if petitioner made a false statement. In his testimony, petitioner never mentioned Luxury or described any part Luxury may have played in earning the finder's fee. When asked directly about business dealings aside from the Recrion transaction, petitioner stated that auto leasing was his only business activity. Petitioner's testimony includes the following exchange in which he answered questions put to him by the SEC attorney: Q: Basically, from the time you arrived in Las Vegas, up until this recent wholesale liquor business that you have bought, you have been in the car leasing business? A: Yes. Q: Any other businesses? A: No, sir.
In relation to such auto leasing activities, petitioner stated that he and Mr. Glick had "investigated the opportunity of buying [Williams Leasing] together because of my knowledge." Once again, he made no mention of Luxury. In September 1975, Mr. Derlachter gave petitioner five cashier's checks totaling $ 62,500, in *22 payment of petitioner's remaining share of the finder's fee. Each of these checks was drawn to the order of "Richard Gordon and/or Luxury Leasing". Nevertheless, all of the checks were endorsed solely in the name "Richard Gordon". Mr. Derlachter does not remember issuing a Form 1099 to either petitioner or Luxury, and neither of the parties to this case has produced a Form 1099. Petitioner received the $ 62,500 from Mr. Derlachter in 1975, in the form of five cashier's checks: two for $ 15,000 each, two for $ 10,000 each, and one for $ 12,500. Petitioner cashed the $ 12,500 cashier's check at NSB and used one $ 10,000 check to satisfy a personal gambling debt at the Riviera Casino in Las Vegas. Petitioner endorsed the two $ 15,000 checks and one $ 10,000 check ($ 40,000 in total) to Ms. Shirley Bonas, as partial payment for his purchase of Best Brands, the liquor wholesaler and distributorship which petitioner had acquired in a heavily leveraged deal in November 1974. In summary, petitioner received eight cashier's checks from Mr. Derlachter during 1974 and 1975 in the aggregate amount of $ 210,500. He received three cashier's checks totaling $ 148,000 during 1974 and five *23 cashier's checks totaling $ 62,500 during 1975. Of the total amount received, he cashed $ 62,500; he used $ 40,000 to fund his personal purchase of Best Brands; he spent $ 10,000 to satisfy a personal gambling debt; and he deposited $ 61,000 into his personal bank account. The record does not account for the remaining $ 37,000. The record also does not explain why petitioner received only $ 210,500, $ 422 less than the amount set forth in the letter dated September 1, 1974, quoted above, in which petitioner acknowledged receipt "of the sum of $ 210,922.00 from Todd Derlachter". A document entitled Minutes of Special Meeting of Board of Directors of Luxury Rental and Leasing Corp., executed by petitioner as sole director of Luxury, states as follows: MINUTES OF SPECIAL MEETING OF BOARD OF DIRECTORS OF LUXURY RENTAL AND LEASING CORP. DATE: February, 1975 Place: 4500 Wynn Road, Las Vegas, Nevada
These minutes are to memorialize previous actions taking [sic] by the director on behalf and for the corporation in his capacity as the chief executive officer and employee of the corporation. The sole director, Richard Gordon, was present. A. Consulting fees during the year *24 1973 in the amount of $ 15,000.00 and 1974 in the amount of $ 30,000.00 was ratified, confirmed and approved. B. Services by the Chairman on behalf of the corporation with respect to the acquisition of the Stardust and Fremont Hotels by companies or entities the principal of whom was A. R. Glick was ratified, confirmed and approved. There being no further business to come before the meeting the same was duly adjourned. RICHARD GORDON - Director
The above document is dated "February    , 1975", with no specific date filled in. An analysis of the ink used for petitioner's signature proves that the document could not have been signed before August 1975. Luxury's Federal income tax returns for the years 1969 through 1975 report the following amounts as taxable income before net operating loss deductions, net operating loss deductions, and taxable income: Taxable Income
Before NOL
NOL
Taxable
Year
Deduction
Deduction
Income
1969
($  1,531.81)
($  1,531.81)
1970
(49,485.04)
(49,485.04)
1971
(32,074.41)
(32,074.41)
1972
26,673.44 ($ 83,091.26)
(56,417.82)
1973
(21,526.13)
(21,526.13)
1974
78,184.00 (77,944.00)
240.00 1975
2,499.00 2,499.00 *25 It is evident from the above schedule that Luxury claimed to have a net operating loss carryover of $ 77,944 available as a deduction in 1974. Petitioner reported $ 148,000 of the finder's fee which he had received from Mr. Derlachter during 1974 on Luxury's 1974 corporate income tax return. Petitioner reported $ 52,500 of the $ 62,500 which he received during 1975 on Luxury's 1975 return. In reporting the finder's fee on Luxury's returns, petitioner offset the finder's fee with Luxury's net operating loss carryover of $ 77,944. This had the effect of reducing Luxury's 1974 taxable income from $ 78,184 to $ 240. Until Luxury's 1974 return was filed, Luxury's income tax returns had each listed its principal business activity as "Rentals & Leases" of automobiles. Luxury's 1974 return, which was prepared by Mr. Bardier and filed on or about August 15, 1975, mentions for the first time consulting services as one of it principal businesses. On petitioner's joint individual income tax returns for 1974 and 1975, he reported the following taxable income and tax: Year
Taxable Income
Taxes Paid
1974
$ 12,609
$ 3,298
1975
93,710
23,391
The above amounts include compensation *26 from Luxury consisting of management fees in the amount of $ 30,000 in 1974 and $ 25,000 in 1975. Petitioner reported no salary or wages from Luxury. If petitioner had included his share of the Recrion finder's fee in the gross income reported on his joint individual income tax return, respondent calculated at petitioner's criminal trial that petitioner would have owed an additional $ 31,442 in tax in 1974, and and additional $ 33,774 in tax in 1975. On April 29, 1981, the office of the United States attorney (U.S. attorney) informed petitioner that the Federal grand jury was considering indicting him for tax evasion and filing false and fraudulent income tax returns. The U.S. attorney gave petitioner 12 days to appear before the grand jury, or to submit an explanatory statement to the grand jury, if he wished to forestall the indictment. On the last day of that period, petitioner's attorneys delivered a letter to the grand jury, which had been drafted by his attorney, Michael Singer, and was signed by petitioner under penalties of perjury. The letter contains a number of inaccurate statements, including the following: (1) that the entire finder's fee had been deposited in *27 Luxury's corporate accounts; (2) that a Form 1099 made out to Richard Gordon and/or Luxury Leasing had been issued for the finder's fee; and (3) that petitioner had shown to Mr. Bardier the $ 10,000 cashier's check which petitioner had used to satisfy the gambling debt. On May 12, 1981, a Federal grand jury in Las Vegas, Nevada, indicted petitioner on two counts of wilfully and knowingly attempting to evade and defeat his Federal income tax for the years 1974 and 1975 in violation of section 7201. The grand jury also indicted petitioner on two counts of wilfully and knowingly making and subscribing a false and fraudulent income tax return for the years 1974 and 1975 in violation of section 7206(1). Count I of the indictment alleges that petitioner violated section 7201 by causing a false and fraudulent income tax return to be filed with the Internal Revenue Service for 1974 on behalf of himself and his wife which reported taxable income of $ 12,609, whereas the correct taxable income for 1974 was $ 123,109. For purposes of count I of the indictment, the Government computed the correct taxable income as follows: Taxable Income Per Return
$  12,609 Finder's fee paid by Todd Derlachter
Check No. 0701-12179
$ 37,000
Check No. 0701-12178
37,000
Check No. 136521
74,000
148,000 Best Brands, Inc.
Check No. 4850
2,500
Check No. 4959
2,500
Check No. 5111
2,500
7,500 Less: Finder's fee reported on return
(30,000)   Finder's fee improperly reported    on 1973 return allowed
(15,000)
Corrected taxable income
$ 123,109 *28 Count II of the indictment alleges that petitioner violated section 7201 by causing a false and fraudulent income tax return to be filed with the Internal Revenue Service for 1975 on behalf of himself and his wife which reported taxable income of $ 93,710, whereas the correct taxable income for 1975 was $ 131,210. For purposes of count II of the indictment, the Government computed the correct taxable income for 1975 as follows: Taxable Income Per Return
$ 93,710 Finder's fee paid by Todd Derlachter
Check No. 147997
$ 15,000
Check No. 147998
15,000
Check No. 147999
10,000
Check No. 148000
10,000
Check No. 148002
12,500
62,500 Less: Finder's fee reported on return
(25,000)
Corrected taxable income
$ 131,210 At the ensuing trial, the United States presented evidence that petitioner had engaged in six different acts or series of acts in violation of the Federal income tax laws. In addition to petitioner's failure to report the Recrion finder's fee on his personal return, the Government introduced evidence to show: (1) that petitioner had overstated the basis of a 57-foot yacht and had underreported its sales price; (2) that he had diverted, for his *29 own use, a $ 10,000 payment made by the Stardust Hotel-Casino to Best Brands without reporting the money as personal income; (3) that he had obtained and failed to report a tax-free "reimbursement" from a client for out-of-pocket advertising expenses when no such expenses had been actually incurred; (4) that he had fraudulently attributed a $ 7,500 consulting fee to Luxury which should have been reported by petitioner personally; and (5) that he had cashed a check issued to Luxury by the Hacienda Hotel & Casino and had failed to report the sum as income to Luxury. On May 11, 1982, after a 5-day trial, Federal District Judge Harry Claiborne, sitting without a jury, found petitioner guilty on all four counts of the indictment. Judge Claiborne issued no special findings of fact. On April 4, 1983, the Ninth Circuit Court of Appeals affirmed the trial court's decision. OPINION 1. Collateral Estoppel
Respondent argues that petitioner is collaterally estopped "from denying the 1974 and 1975 finder's fee was taxable to him". According to respondent, this is true "by virtue of the petitioner's prior trial and conviction for tax evasion and filing false tax returns for 1974 and *30 1975." Collateral estoppel precludes a party to a suit and his privies from relitigating, in a later suit on a different cause of action, the issues of fact and law which were actually and necessarily decided by the court in reaching its judgment in the first action. United States v. Mendoza, 464 U.S. 154, 158 (1984); Commissioner v. Sunnen, 333 U.S. 591, 597-598 (1948). The party who raises collateral estoppel, like the party who raises any affirmative defense, has the burden of proving its elements. Rules 39, 142(a); Calcutt v. Commissioner, 91 T.C. 14, 20-21 (1988). In this case, respondent must prove that the application of collateral estoppel is appropriate under the 3-prong test set forth by the Supreme Court in Montana v. United States, 440 U.S. 147, 155 (1979). Respondent must prove: (1) that the issues presented are, in substance, the same as those resolved by petitioner's criminal conviction for tax evasion and false statement; (2) that the controlling facts or legal principles have not changed significantly since the criminal trial; and (3) that *31 there are no other special circumstances which warrant an exception to the normal rules of preclusion. Respondent contends that collateral estoppel applies in this case by reason of petitioner's conviction under counts I and II for wilfully, knowingly attempting to evade and defeat his income taxes for 1974 and 1975. To be sustained on this contention, respondent must prove that the issues in this proceeding were actually and necessarily decided by the District Court when it convicted petitioner on counts I and II of the indictment. See United States v. Mendoza, supra; Commissioner v. Sunnen, supra.
Respondent notes that "with the exception of three checks totaling $ 7,500.00 in count I, the remaining figures that made up count I and count II came directly from the finder's fee issue which is the only issue before this Court." According to respondent, petitioner's conviction on counts I and II involved "the issue of whether petitioner evaded income taxes by failing to report the finder's fee". Respondent argues, "the only issue raised in this proceeding [is] whether the Recrion finder's fee from the Recrion *32 deal was earned by petitioner." Respondent also argues that this issue "was an intermediate or evidentiary fact determined in the prior criminal trial". Thus, according to respondent, "petitioner is collaterally estopped from raising this ultimate issue (failure to report income) or changing the evidentiary facts (who earned the income) in the subsequent civil litigation." Respondent cites Meier v. Commissioner, 91 T.C. 273 (1988), to support this argument. We disagree. We note that in order to find a taxpayer guilty of evasion under section 7201, it is not necessary for the Government to prove, or for the court to find, the exact amount of unreported income. United States v. Thompson, 806 F.2d 1332, 1335-1336 (7th Cir. 1986); Watts v. United States, 212 F.2d 275, 277 (10th Cir. 1954); United States v. Marks, 282 F. Supp. 546, 547-548 (D. Or. 1966), affd. 391 F.2d 210 (9th Cir. 1968). It is only necessary that there be substantial evidence from which the trier of fact can find that a substantial amount of net income was not reported, *33 and that the failure to so report it was willful and intentional. Watts v. United States, supra; United States v. Marks, supra.
In this case, the District Court found petitioner guilty on both counts I and II. However, in announcing its decision, the court did not set forth any finding from which the basis for petitioner's conviction can now be determined. As to count I of the indictment, the issue before the District Court Judge was whether petitioner had wilfully attempted to evade and defeat his 1974 income tax by failing to report the three checks which Mr. Derlachter had given to petitioner in 1974, or by failing to report the three checks totaling $ 7,500 which the Government claimed petitioner had diverted from Best Brands, Inc.The District Court could have based petitioner's conviction under count I on any of the checks enumerated in count I of the indictment, including the three checks drawn by Best Brands, Inc. These three checks have nothing to do with the finder's fee at issue in this proceeding. Thus, petitioner's conviction under count I did not require the District Court to find that petitioner *34 had earned as income the three checks which he received from Mr. Derlachter. Petitioner's conviction under count I, therefore, did not require the District Court to actually and necessarily decide the issue in this case, as required for the application of collateral estoppel. See United States v. Mendoza, 464 U.S. 154, 158 (1984); Commissioner v. Sunnen, 333 U.S. 591, 597-598 (1948). Similarly, as to count II of the indictment, the issue before the District Court was whether petitioner had wilfully attempted to evade and defeat his 1975 income tax by failing to report any one or all of the five checks totaling $ 62,500 which Mr. Derlachter gave to petitioner during 1975. It is clear that the District Court could not have convicted petitioner on count II without finding that petitioner had earned at least one of the checks which he received from Mr. Derlachter. However, it is equally clear that the District Court did not have to find that petitioner was required to report all five of the checks as income. Respondent argues that petitioner should be collaterally estopped from denying that he is the true earner of all *35 of the checks received from Mr. Derlachter during 1975. The problem is that the conviction could have been based on fewer than all of the checks and we do not know which of the checks formed the basis of petitioner's conviction by the District Court. Therefore, we cannot find that the District Court actually and necessarily decided that petitioner had earned all of the checks received from Mr. Derlachter during 1975, as required for application of the doctrine of collateral estoppel. See Commissioner v. Sunnen, supra.
2. True Earner of the Recrion Finder's Fee
The main question to be answered in this case is simply: Who earned the finder's fee at issue, petitioner or his wholly owned corporation? Respondent's notice of deficiency determined that petitioner had earned the finder's fee. Petitioner bears the burden of proving that respondent's notice of deficiency is in error. Rule 142(a). Accordingly, petitioner bears the burden of proving that he did not earn the subject finder's fee or that Luxury did. Generally, income must be taxed to the person who earns it. E.g., Lucas v. Earl, 281 U.S. 111 (1930). *36 This is a fundamental principle of tax law. Commissioner v. Culbertson, 337 U.S. 733, 739-740 (1949). Nevertheless, it is often difficult to identify the true earner of income, especially as between an individual and his personal services corporation or his wholly owned corporation, such as Luxury. See, e.g., Sargent v. Commissioner, 93 T.C. 572 (1989), revd. 929 F.2d 1252 (8th Cir. 1991); Johnson v. Commissioner, 78 T.C. 882 (1982); Keller v. Commissioner, 77 T.C. 1014, 1032 (1981), affd. 723 F.2d 58 (10th Cir. 1983). In Johnson v. Commissioner, supra at 890, we described the problem as follows: The realities of the business world prevent an overly simplistic application of the Lucas v. Earl rule whereby the true earner may be identified by merely pointing to the one actually turning the spade or dribbling the ball. Recognition must be given to corporations as taxable entities which, to a great extent, rely upon the personal services of their employees to *37 produce corporate income. When a corporate employee performs labors which give rise to income, it solves little merely to identify the actual laborer. Thus, a tension has evolved between the basic tenets of Lucas v. Earl and recognition of the nature of the corporate business form. [Fn. ref. omitted.]
In Johnson v. Commissioner, supra, this Court set forth a test for determining the true earner of income in cases involving the services of a corporate employee. That test consists of the following two factors which must be established in order for the corporation, rather than the employee, to be considered the true earner of the income: First, the service-performer employee must be just that -- an employee of the corporation whom the corporation has the right to direct or control in some meaningful sense. * * * Second, there must exist between the corporation and the person or entity using the services a contract or similar indicium recognizing the corporation's controlling position. [Id. at 891; citations omitted.]
We have applied the Johnson test in cases involving the services performed *38 by the sole shareholder of a corporation. See, e.g., Bagley v. Commissioner, 85 T.C. 663, 675 (1985), affd. 806 F.2d 169 (8th Cir. 1986); Worthley v. Commissioner, T.C. Memo. 1988-262; North v. Commissioner, T.C. Memo. 1986-215. The test has been adopted by other courts. E.g., Sargent v. Commissioner, 929 F.2d 1252, 1256 (8th Cir. 1991), revg. 93 T.C. 572 (1989); Knigge v. Commissioner, 756 F.2d 1377, 1378 (9th Cir. 1985); Johnson v. United States, 698 F.2d 372, 374 (9th Cir. 1982). But see Schuster v. Commissioner, 800 F.2d 672, 677-678 (7th Cir. 1986), affg. 84 T.C. 764 (1985); Fogarty v. United States, 780 F.2d 1005, 1012-1013 (Fed. Cir. 1986). In the instant case, petitioner acknowledges that the Johnson test is applicable. As to the first element of the test, petitioner argues that he acted in his capacity as an employee of Luxury when he earned *39 the Recrion finder's fee. He notes that respondent has not disputed that, from its incorporation in 1969 until the Recrion deal, Luxury was his sole source of full-time employment. Petitioner testified that until he acquired Best Brands, he conducted all of his business activities through Luxury. From this employment relationship, petitioner apparently reasons that Luxury per se controlled his actions. Addressing the second element of the Johnson test, petitioner admits that Luxury never executed an explicit written or oral agreement with Mr. Glick, and that it never had such a specific understanding with Mr. Derlachter. However, petitioner asserts that all of those who transacted business with him were aware that he conducted all of his business operations through Luxury. He points to Mr. Glick's and Mr. Derlachter's testimony that they were given no indication that petitioner did not act as an agent of Luxury in the Recrion deal. Petitioner attempts to buttress his assertion, that Mr. Glick and Mr. Derlachter accepted the role of Luxury, by portraying the Recrion deal as just another in a series of "consultations" by Luxury. He claims that, since its inception, Luxury *40 had been not only in the leasing business, but also in the "consulting business". In support of this assertion, petitioner testified that, as an employee of Luxury, he consulted on real estate management for Judy Bailey, he consulted in hotel and casino management for the Hacienda, and he consulted in an attempted purchase of Williams Leasing by Mr. Glick. He further argues that "automobile leasing is primarily a consulting type field." Beyond this, petitioner reasons that, absent Luxury, he never would have been in a position to make the deal, and, therefore, he must have been acting as Luxury's agent. He asserts that he became acquainted with Mr. Glick only through his Luxury business dealings. Further, petitioner testified that Mr. Glick presented to him the idea of acquiring more casino property while petitioner was in California on business for Luxury. Petitioner contends that his exercise of personal dominion over the funds from the transaction should have no bearing on this Court's decision. He admits to a general and ongoing intermingling of personal and corporate funds, but stresses that he paid his accountants large sums of money to sort the personal from the corporate *41 and to keep account of the bottom line for each. He also admits that he used funds which technically belonged to Luxury for personal purposes. However, he argues that such amounts were treated as loans, and that exacting records were kept so that at all times his accountants knew how much petitioner owed Luxury or visa versa. Petitioner further explains that the $ 62,500 note owed on the Recrion deal was characterized on his personal financial statements as owed to him personally strictly for convenience, to break down his individual and corporate assets on the same financial statement. We disagree. Applying the Johnson test to the present case, we hold that petitioner has failed to meet his burden of proving that Luxury earned the finder's fee. The second element of the test requires that "The corporation's controlling position must be recognized by a contract or similar indicium between the corporation and the person or entity receiving the performer's services." As discussed below, petitioner failed not only to prove that Mr. Glick or Mr. Derlachter recognized Luxury's role in this transaction, but also to show that Luxury assumed any role whatsoever in the transaction. *42 In light of petitioner's failure to prove the second element of the test, it is not necessary to discuss petitioner's contention that Luxury qualified under the first element. Petitioner has introduced no documentary evidence to show that Mr. Glick or Mr. Derlachter recognized that Luxury controlled petitioner's actions in the Recrion deal. For example, he introduced no correspondence or contract between Mr. Glick or Mr. Derlachter and Luxury. In fact, to the contrary, the documents which were drawn up in the immediate aftermath of the transaction fail to mention Luxury and, thereby, suggest that Luxury played no role in the Recrion deal. The Form 10-K which Mr. Glick filed with the SEC after the transaction discusses the roles of Mr. Derlachter and petitioner in facilitating the deal, but it does not mention Luxury. Perhaps most significantly, the letter dated September 1, 1974, in which petitioner disclaimed any right to further compensation for his role in the Recrion deal also fails to mention Luxury. The letter was prepared on Mr. Glick's behalf and was executed by petitioner. It is evident from the nature of the letter that Mr. Glick would have required a similar disclaimer *43 from Luxury, if he had been told that Luxury had played any role in the transaction. The fact that Luxury is not mentioned in the letter is persuasive evidence that Mr. Glick had no reason to believe that Luxury had played a role in the transaction. Mr. Glick's testimony during petitioner's criminal trial is consistent with that conclusion and lends no support to petitioner's argument. Mr. Glick did not testify to any agreement or understanding that recognized Luxury's involvement. Petitioner argues that an explicit agreement was unnecessary because Mr. Glick realized that petitioner conducted all of his business through Luxury. However, at trial Mr. Glick merely testified that he considered petitioner and Luxury to be one and the same "as far as cars" were concerned. This deal obviously went beyond the scope of that statement. Moreover, when specifically asked about Luxury's role in the Recrion deal during petitioner's criminal trial, Mr. Glick responded that he was unaware of any involvement it may have had. The criminal trial transcript reflects the following testimony by Mr. Glick: Q: Mr. Glick, do you know what role, if any, Luxury Leasing played in the transaction *44 which you have been describing to the Court? A: No, I don't. Q: Did they play any role that you knew of? A: If they did, I'm not aware of it. I don't know the circumstances.
Similarly, Mr. Derlachter's testimony and actions lend no credence to petitioner's claims. Mr. Derlachter did not testify as to any agreement or understanding regarding Luxury's part in the arrangement. Mr. Derlachter had no knowledge of any role Luxury might have played in the transaction. At trial, Mr. Derlachter testified as follows: Q: Do you recall what Luxury Leasing had to do, if anything, with your negotiations on behalf of Mr. Coleman? A: His participation involved the negotiations with Mr. Glick. With Mr. Coleman, it was just Mr. Glick and myself. Q: I see. And you mentioned in connection with Mr. Glick. Did Luxury Leasing, to your knowledge, have anything to do with the negotiations with Mr. Glick? A: I don't know that.
Furthermore, Mr. Derlachter's method of paying petitioner his portion of the finder's fee fails to support any contention that Luxury was a part of the deal. Mr. Derlachter issued the cashier's checks for the 1974 portion of the payment to petitioner *45 as an individual. Only on petitioner's request, which was made sometime before the September 1975 installment was paid, did Mr. Derlachter add Luxury's name as a joint payee on the checks. Petitioner recites certain facts and circumstances, which emphasize his use of Luxury to conduct business, and he asks the Court to find that petitioner was acting for Luxury when he introduced Mr. Glick to Mr. Derlachter and, thereby, earned a share of the subject finder's fee. See Schuster v. Commissioner, 800 F.2d 672, 677-678 (7th Cir. 1986), affg. 84 T.C. 764 (1985); Fogarty v. United States, 780 F.2d 1005, 1012-1013 (Fed. Cir. 1986). We do not accept petitioner's argument, first, because we do not accept all of the facts and circumstances enumerated by petitioner. For example, we do not believe that petitioner has proven that "Richard Gordon has always transacted business through Luxury Leasing and considered all business opportunities which arose to be the business opportunities of Luxury Leasing". As proof of that fact, petitioner relies on his testimony at trial. However, after observing petitioner *46 as a witness, we do not credit much of his testimony. Similarly, we do not accept petitioner's contention that his accountants maintained loan accounts which accurately accounted for his personal use of moneys earned by Luxury or Best Brands. We agree with respondent that there is no evidence that such loan accounts existed until shortly prior to petitioner's indictment on the criminal tax violations described above. Finally, we do not accept petitioner's contention that "Todd Derlachter and Allen Glick were aware at all relevant times that Richard Gordon conducted his business affairs on behalf of Luxury Leasing". As discussed above, petitioner has advanced no satisfactory evidence that either Mr. Glick or Mr. Derlachter knew of any involvement of Luxury in the subject transaction. In addition to rejecting key portions of petitioner's version of the facts and circumstances, we do not accept petitioner's argument because it fails to satisfactorily explain why no mention is made of Luxury in the Form 10-K filed on behalf of Mr. Glick's corporation shortly after it acquired the casino properties, or why no mention is made of Luxury in Mr. Gordon's letter of September 1, 1974, in *47 which he acknowledges receipt of his share of the finder's fee and disclaims any agreement between himself and Argent Corp., its officers, directors, or agents for the payment of a finder's fee. Finally, petitioner's argument fails to satisfactorily explain why he did not disclose Luxury's role in the Recrion deal during his testimony before the SEC. Taking all of the facts and circumstances of this case into account, we believe that they support respondent's contention that petitioner earned the finder's fee in his individual capacity. This is consistent with the absence of reference to Luxury in both the Form 10-K filed on behalf of Mr. Glick's corporation, and petitioner's letter dated September 1, 1974, addressed to Argent Corp. and Mr. Derlachter. It is also consistent with petitioner's financial statements dated September 30, 1974, and August 31, 1975, which list the second installment of the finder's fee as petitioner's personal asset. Finally, this is consistent with the petitioner's personal use of the finder's fee. We agree with respondent that Luxury's professed participation did not allegedly come about until after petitioner had hired a new accountant, Mr. Bardier, *48 and it became evident, in preparing Luxury's 1974 income tax return, that the corporation had a substantial net operating loss carryover. Petitioner then treated the finder's fee as having been earned by Luxury for tax purposes. To substantiate that position, petitioner caused the 1974 and 1975 returns to include "consulting" as a business activity, and petitioner asked Mr. Derlachter to make the 1975 checks payable to Luxury and himself. For the foregoing reasons, Decision will be entered for respondent.